**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

EVERGREEN INTERNATIONAL, S.A.,
*Plaintiff-Appellant,*

v.

NORFOLK DREDGING COMPANY,
*Defendant-Appellee,*

and

MARINEX CONSTRUCTION COMPANY,
*Defendant.*

No. 07-1879

EVERGREEN INTERNATIONAL, S.A.,
*Plaintiff-Appellee,*

v.

NORFOLK DREDGING COMPANY,
*Defendant-Appellant,*

and

MARINEX CONSTRUCTION COMPANY,
*Defendant.*

No. 07-1944

Appeals from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(2:04-cv-22351-PMD)

Argued: May 14, 2008

Decided: June 25, 2008

Before MOTZ, Circuit Judge, HAMILTON, Senior Circuit Judge,
and Claude M. HILTON, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Motz and Senior Judge Hilton joined.

---

**COUNSEL**

**ARGUED:** David Michael Collins, BUIST, MOORE, SMYTHE, MCGEE, PA, Charleston, South Carolina, for Appellant/Cross-appellee. David Harlen Sump, CRENSHAW, WARE & MARTIN, PLC, Norfolk, Virginia, for Appellee/Cross-appellant. **ON BRIEF:** Gordon D. Schreck, Julius H. Hines, BUIST, MOORE, SMYTHE, MCGEE, PA, Charleston, South Carolina, for Appellant/Cross-appellee.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

This is a case within the district court's admiralty jurisdiction. The appeal comes to us after a six-day bench trial on cross-claims of negligence under general maritime law. The cross claims stem from an allision[1] between a container ship, the M/V Ever Reach, and a submerged dredge spoil pipeline located outside the federally marked navigational channel of the Cooper River in Charleston, South Carolina.

On appeal, Plaintiff Evergreen International, S.A. (Evergreen), owner of the M/V Ever Reach, challenges as inadequate the district court's final judgment in its favor ordering defendant Norfolk Dredging Company (Norfolk), the owner and operator of the dredge spoil pipeline involved in the allision, to pay it $898,975.42, plus prejudgment interest from March 31, 2003. Evergreen asks that we reject certain findings of the district court as clearly erroneous, vacate the final judgment, and remand to the district court with instructions to reas-

---

[1]"An allision is a collision between a moving vessel and a stationary object." Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-2 n.1 (4th ed. 2004).

sess the parties' respective fault under a burden-shifting proof scheme more favorable to itself and to raise Norfolk's damages cap under the Oil Pollution Act of 1990 (the OPA), 33 U.S.C. §§ 2701-2761.

On cross-appeal, Norfolk challenges as clearly erroneous the district court's finding that it was ten-percent at fault for the allision. According to Norfolk, it bears absolutely no fault for the allision, and therefore seeks reversal of the judgment *in toto*. Norfolk also takes issue with the district court's calculation of its damages cap under the OPA. In the event we uphold the district court's finding that it was ten-percent at fault, Norfolk asks that we vacate the judgment and remand with instructions for the district court to lower its damages cap under the OPA to comply with its view of the statutory requirements of the OPA.

For the reasons that follow, we affirm *in toto*.

I.

On February 14, 2002, the United States Army Corps of Engineers (the Corps) awarded a contract (the Contract) to Marinex Construction Company (Marinex), for "new work and maintenance dredging" in the Cooper River between the stretch of the river charted as Shipyard Creek and the turning basin above the North Charleston Container Terminal ("the Dredging Project"). (J.A. 1267) (internal quotation marks omitted). Two adjacent sections of this stretch of the Cooper River, charted as Daniel Island Bend and Clouter Creek Reach, are relevant to the issues on appeal. Also relevant to the issues on appeal, the Contract required the work to be conducted "in such a manner as to obstruct navigation as little as possible" and in compliance with the Corps' Safety and Health Requirements Manual EM-385-1-1 (the Corps' Manual). (J.A. 1379). Notably, the Contract and the Corps' Manual both provided that the "[s]ubmerged pipeline shall rest on the channel bottom where a pipeline crosses a navigation channel and while submerged;" and "the top of the pipeline . . . shall be no higher than the required project depth for the navigation channel in which the pipe is placed." (J.A. 1381).

Marinex hired Norfolk as a subcontractor on the Dredging Project. The written subcontract between Marinex and Norfolk (the Subcon-

tract) required Norfolk to "perform all work in accordance with U.S. Army Corps of Engineers Plans and Specifications." (J.A. 1267) (internal quotation marks omitted).

Norfolk owns and operates various types of dredging equipment, including a hydraulic dredge named the Charleston (the Dredge Charleston), which is 250 feet long and fifty feet wide. The Dredge Charleston operated by swinging a rotating cutter-head along the river bottom through the use of swing anchors positioned several hundred feet to either side of the Dredge Charleston. The dredge spoil created by operation of the Dredge Charleston would then be pumped by the Dredge Charleston to a designated disposal area through a series of floating and submerged pipelines.

On September 19, 2002, upon Norfolk's completion of dredging the Daniel Island Bend and Clouter Creek Reach to approximately two feet below the depth required by the Subcontract, Norfolk laid a submerged dredge spoil pipeline across the dredged bottom of the federally marked navigational channel of the Cooper River, beginning in the vicinity of Navy Pier "U". Navy Pier "U" lies approximately where the Daniel Island Bend transitions to Clouter Creek Reach on the western edge of the west side of the Cooper River, which side in admiralty parlance is referred to as the green side.[2] Each of the submerged dredge spoil pipeline sections consisted of a 120-foot length of 24-inch diameter steel pipe with mating ball and socket joints welded on each end. The submerged dredge spoil pipeline emerged from the red side of the federally marked navigational channel in the vicinity of the transition between the dredged channel and the undredged channel, followed the channel slope up to the river flats and connected to the supply line at a location known as "cable tight."[3] Notably, the channel slope was outside the red side of the federally marked navigational channel. Every morning, Norfolk issued daily position reports indicating the area in which the Dredge Charleston and its attendant equipment were operating.

---

[2]The east side of the Cooper River is known in admiralty parlance as the red side.

[3]Neither a statute or regulation, nor a Contract or Subcontract provision required the marking of a properly laid submerged dredge spoil pipeline.

During the period from September 19, 2002 to September 30, 2002, Norfolk's submerged dredge spoil pipeline operated without incident across the federally marked navigational channel and up the channel slope outside the red side of the federally marked navigational channel in the Daniel Island Bend. Indeed, at least twenty-three vessels, with drafts at or deeper than the thirty-six foot, eleven inch draft of the M/V Ever Reach, navigated over this submerged dredge spoil pipeline without incident.

On the morning of September 30, 2002, the Dredge Charleston conducted dredging operations in the green side of the Daniel Island Bend. An attached anchor to the Dredge Charleston was deployed at approximately two-thirds of the distance across the red side of the federally marked navigational channel in the Daniel Island Bend. Attached to the anchor was an anchor buoy lit by a flashing yellow light, and attached to the anchor buoy was a small crane barge named the Didapper. The Didapper measured approximately twenty-five feet by forty-five feet and had a flashing yellow light attached to it as well.

At approximately 3:00 a.m. on September 30, 2002, the M/V Ever Reach, which is 965 feet long and 106 feet wide, approached the entrance to Charleston Harbor bound for the North Terminal in North Charleston. Forty-five minutes later, Charleston Branch Pilot Stephen Swan, Jr. (Pilot Swan) boarded the M/V Ever Reach to assist its crew, headed by Captain Liu, in making the transit up the Cooper River to the North Terminal. An assist tug also tethered to the M/V Ever Reach at its stern.

At approximately 4:00 a.m., Pilot Swan contacted the Dredge Charleston to determine its current location and set-up. Dredge Charleston Leverman Jan Hewitt (Leverman Hewitt) responded that the Dredge Charleston had moved up river some since the previous day, and that there was a "swinging anchor across the ranges into the red side. It's pretty well out there, out of the way." (J.A. 1272) (internal quotation marks omitted). At trial, Leverman "Hewitt testified that 'across the ranges' meant on the opposite side of the channel centerline, *i.e.*, in the 'red' side of the federal channel." *Id.* In response to Pilot Swan's query as to whether he should proceed between the Dredge Charleston and the marker buoy for the swinging anchor, Leverman Hewitt answered in the affirmative. Leverman Hewitt then

requested that Pilot Swan give him fifteen minutes notice in order that he could "move the stern over and give [Pilot Swan] a wide hole." (J.A. 1273) (internal quotation marks omitted). Pilot Swan responded that his vessel was "fairly deep and pretty large," and that "all the room you can give us we would sure appreciate." *Id.* (internal quotation marks omitted).

Shortly after 5:00 a.m., Pilot Swan again contacted the Dredge Charleston and stated that he would reach it in about twenty-five minutes. Leverman Hewitt answered that he would "get the stern over." *Id.* (internal quotation marks omitted). At about 5:20 a.m., Leverman Hewitt reported that he had "moved out of the way" and would see the M/V Ever Reach "on one whistle." *Id.* (internal quotation marks omitted).

Based upon Leverman Hewitt's descriptions, Pilot Swan expected the Didapper to be well out of the way on the red side. However, once the M/V Ever Reach got within one-half mile of the Dredge Charleston and its attendant equipment, Pilot Swan could see that the Didapper was located closer to the middle of the red side of the federally marked navigational channel than he had expected based upon Leverman Hewitt's descriptions. Pilot Swan estimated that the actual distance between the Dredge Charleston and the Didapper at the time of the allision was approximately 375 feet.

Despite his surprise as to the position of the Didapper and his preference for a wider hole to navigate, Pilot Swan never requested that the Didapper be moved. Instead, he continued up river, delaying his turn to port into the straight away for Clouter Creek Reach until both the M/V Ever Reach and the assist tug had cleared the Didapper. This left the M/V Ever Reach further over to the red side of the channel to make the turn than normally would have been the case. Unbeknownst to those aboard the M/V Ever Reach at the time, in the course of turning into Clouter Creek Reach, the M/V Ever Reach had strayed fifty feet outside the right edge of the red side of the federally marked navigational channel, grounding on the soft promontory in approximately twenty-seven feet of water and alliding with Norfolk's

submerged dredge spoil pipeline which rested on such promontory and ran up the channel bank.[4]

The allision caused significant damage to the underwater hull of the M/V Ever Reach, including a breach of the No. 4 Starboard fuel tank, which breach resulted in the spilling of several thousand gallons of oil into the Cooper River. The allision also caused damage to Norfolk's submerged dredge spoil pipeline. Evergreen has incurred expenses to repair the M/V Ever Reach's hull, to remove oil from the Cooper River, to resolve the claims of various third parties whose vessels or property were affected by the oil spill, and to assess damages to the environment.

On September 24, 2004, Evergreen invoked the district court's admiralty jurisdiction, 28 U.S.C. § 1333(1), by filing a general maritime law negligence cause of action against Norfolk,[5] alleging that: (1) Norfolk acted negligently in its placement of the Dredge Charleston, the attendant equipment, and the submerged dredge spoil pipeline in the navigable waters of the United States; (2) Norfolk acted negligently in marking the Dredge Charleston, the attendant equipment, and the submerged dredge spoil pipeline located in the navigable waters of the United States; and (3) Norfolk acted negligently in describing to Pilot Swan the location of its dredging equipment in the navigable waters of the United States, in particular, in describing the location of the Didapper. Evergreen alleged that such negligence proximately caused the allision between the M/V Ever Reach and the submerged dredge spoil pipeline. Evergreen sought to recover for the hull repair expenses, oil spill clean up costs, third-party settlement expenditures, and other losses it incurred in connection with the allision.

---

[4]Of relevance in this appeal, the district court made a factual finding that 375 feet constituted sufficient space in the federally marked navigational channel for the M/V Ever Reach to make a safe turn to port into Clouter Creek Reach if approached properly.

[5]Evergreen also named Marinex as a defendant. The district court dismissed Evergreen's claims against Marinex on the ground that Norfolk was acting as an independent contractor over whom Marinex exercised no direct supervision or control. Evergreen has not appealed such dismissal

Norfolk, in turn, claimed that the negligence of the M/V Ever Reach's captain and Pilot Swan proximately caused the allision. Accordingly, Norfolk argued that Evergreen is liable for the full amount of its own damages, and also asserted a negligence counterclaim against Evergreen under general maritime law to recover for the damage done to its submerged dredge spoil pipeline.

Following a six-day bench trial, the district court found that Evergreen was ninety-percent at fault for the allision by the M/V Ever Reach's crew not using all available means to determine the location of the Didapper and not changing course sooner. The district court found that Norfolk was ten-percent at fault by Leverman Hewitt's failure to accurately describe the location of its dredging equipment to Pilot Swan. Based upon this apportionment of fault, the district court ordered Norfolk to pay Evergreen $898,975.42 in damages, plus prejudgment interest.

Evergreen noted a timely appeal, and Norfolk noted a timely cross-appeal.

## II.

Findings of fact following a bench trial in an admiralty case are reviewed under the clearly erroneous standard of review, construing the evidence in the light most favorable to the appellee. *Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc.*, 774 F.2d 648, 654 (4th Cir. 1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

Notably, questions of negligence in admiralty cases, for example causation and apportionment of fault are treated as factual issues, and therefore, are subject to the clearly erroneous standard of review. *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 823 (4th Cir. 1992); *Ente Nazionale*, 774 F.2d at 654. Moreover, when a district court's factual finding in a bench trial is based upon assessments of witness credibility, such finding "is deserving of the highest degree of appellate deference." *United States Fire Ins. Co.*, 966 F.2d at 824.

### III.

The negligence cause of action claimed by Evergreen and the negligence cause of action cross claimed by Norfolk both arise under the general maritime law of the United States, which is the substantive law applicable in this case. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996); *Leathers v. Blessing*, 105 U.S. 626, 627 (1881). Under maritime tort law, liability for collisions as well as allisions is apportioned based upon comparative fault. *Fischer v. S/Y Neraida*, 508 F.3d 586, 593 (11th Cir. 2007); *Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995); *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 162-65 (4th Cir. 1984). "The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law, free of 'inappropriate common law concepts.'" Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-2 (4th ed. 2004) (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)).

Evergreen first challenges as clearly erroneous the district court's finding that Norfolk had properly placed and marked its submerged dredge spoil pipeline involved in the allision. Evergreen argues that such finding is clearly erroneous because, by failing to lay the pipeline completely within a recently dredged area, Norfolk failed to comply with Paragraph 1.5.7 of the Contract (made applicable to Norfolk via the Subcontract), which required it "to conduct the work in such a manner as to obstruct navigation as little as possible." (J.A. 1379). Relying primarily upon *Marine Contracting & Towing Co. v. McMeekin Constr. Co.*, 302 F. Supp. 804 (D.S.C. 1969), Evergreen contends that the "navigation" to which this quote refers includes the full width of the Cooper River, not just the federally marked navigational channel. Accordingly, Evergreen contends the district court also clearly erred in finding that Pilot Swan acted negligently in straying approximately fifty-feet outside the federally marked navigational channel in piloting the M/V Ever Reach through the Daniel Island Bend. Under these circumstances, Evergreen argues, Norfolk is one-hundred-percent at-fault for the allision despite the fact that the allision occurred outside the federally marked navigational channel.

Evergreen's argument on this issue is without merit. First, our circuit precedent has long held that "a dredge lawfully engaged in dig-

ging will be regarded as free from fault [in an allision] if there is ample free water for passage." *The Freeport*, 99 F.2d 842, 843 (4th Cir. 1938). Here, the district court found that the M/V Ever Reach had ample free water, *i.e.*, 375 feet, in the federally marked navigational channel, free from obstruction by any equipment of Norfolk, to make a safe turn to port out of the Daniel Island Bend and proceed up river without incident, and Evergreen has not shown that this finding is clearly erroneous.

Second, Evergreen's reliance upon *Marine Contracting & Towing Co.* is misplaced, because it is factually distinguishable in critical respects. The defendant in *Marine Contracting & Towing Co.* was a contractor retained to demolish a railroad bridge over the Ashley River in Charleston, South Carolina. *Id.* at 805. "The Defendant had removed all visible evidences of the trestle save for the clearly observable dolphin located near the previous pivot pier." *Id.* at 808. However, unbeknownst to those navigating the Ashley River, the defendant contractor had only demolished Pier 5 to a point eleven feet below the surface. *Id.* The plaintiff's barge, which had a draw of twelve feet, subsequently allided with the submerged remainder of Pier 5. *Id.* at 807. In an action for negligence under general maritime law against the defendant contractor, the plaintiff alleged the defendant contractor's failure to mark the submerged remainder of Pier 5 proximately caused the allision.

"The [d]efendant [contractor sought to] excuse its failure to provide suitable warning buoys by observing that it had demolished [P]ier 5 to a point 11 feet below the surface and that such depth was sufficient for safe passage by the small craft which, under its contention, were the only vessels that should have been expected in the area." *Id.* at 809. In rejecting the defendant contractor's argument, the district court held that the defendant contractor could not find excuse for its culpable failure to mark properly the submerged remainder of Pier 5, because it improperly and without reason assumed that craft with a depth of more than eleven feet would not use what the U.S. Coast and Geodetic Chart in effect at the relevant time showed was a safe passage for vessels twice such depth. *Id.* The district court also held that the pilot of the tug boat pulling the barge was not negligent in following the courses he did, because "[t]he tug and barge were not limited to the dredged channel; they were entitled to the full reach of the nav-

igable stream, as it was delineated as safe for boats of the depth of the tug and barge on the [U.S. Coast and] Geodetic Chart [in effect at the time of the allision]." *Id.* at 810 (internal quotation marks omitted).

Here, there is no evidence in the record that the location of the M/V Ever Reach's allision with Norfolk's submerged dredge spoil pipeline in twenty-seven feet of water was delineated as safe for vessels such as the M/V Ever Reach with a draft of thirty-six feet, eleven inches on any relevant geodetic chart of the Cooper River. Accordingly, *Marine Contracting & Towing Co.* provides no basis for us to overturn as clearly erroneous the district court's findings of comparative fault in this case.

## IV.

Next, Evergreen argues that the district court erroneously failed to afford it the benefit of the Pennsylvania Rule when the district court made its comparative fault findings. According to the Pennsylvania Rule as first stated, when:

> a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, . . . the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*The Pennsylvania*, 86 U.S. 125, 136 (1873). There is no dispute that the Pennsylvania Rule equally applies to allisions such as occurred in this case. Moreover, although the rule speaks of a statutory violation, it is equally applicable to violations of federal regulations. *Belden v. Chase*, 150 U.S. 674, 698 (1893). Notably, the Pennsylvania Rule does not establish fault; rather, it shifts the burden of proof on the element of causation to the party who violated the statutory rule or regulation at issue to prove that such violation could not reasonably be held to have been the cause of the collision or allision. *U.S. Fire Ins. Co.*, 966 F.2d at 824-25.

Here, Evergreen contends that it is entitled to application of the

Pennsylvania Rule because it has established that Norfolk committed two clear violations of the Contract (made applicable to Norfolk via the Subcontract), one of which also constitutes a violation of the Corps' Safety Manual.[6] In this regard, Evergreen first contends that Norfolk violated the provision of the Contract, which also appears in the Corps' Safety Manual, requiring any submerged pipeline crossing a navigational channel to rest on the channel bottom. In support of this contention, Evergreen points to expert testimony that as Norfolk's pipeline crossed the federally marked navigational channel of the Cooper River, it did not lay completely flat on the bottom. Second, Evergreen reiterates its contention that Norfolk failed to comply with the Contract requirement "to conduct the work in such a manner as to obstruct navigation as little as possible." (J.A. 1379). Evergreen attempts to cloak the contractual provisions upon which it relies with the imprimatur of a federal regulation by pointing out that federal contracting regulations require dredging contracts such as the one involved here to include an accident prevention clause requiring compliance with the Corps' Safety Manual. *See* 48 C.F.R. § 36.513 (providing that a contracting officer shall include accident prevention clause requiring compliance with Corps' Safety Manual in contract when a fixed price construction contract or a fixed-price dismantling, demolition, or removal of improvements contract is expected to exceed the simplified acquisition threshold).

Evergreen's argument on appeal with respect to the Pennsylvania Rule is without merit. At a minimum, violations of the contractual provisions relied upon by Evergreen to invoke the Pennsylvania Rule are inoperative to invoke such rule because neither contractual provision is a statute or federal regulation. Moreover, Evergreen cites no authority for its proposed extension of the Pennsylvania Rule to a showing of noncompliance with a provision of the Corps' Safety Manual. The provisions of such manual are not federal regulations. Moreover, their inclusion in a government contract with a dredging contractor only makes them contractual terms, not regulations. In

---

[6]The district court found that Norfolk complied with the two contract provisions upon which Evergreen relies to invoke the Pennsylvania Rule, and thus did not apply the Pennsylvania Rule in apportioning fault for the allision.

sum, the district court did not err in failing to afford Evergreen the benefit of the Pennsylvania Rule.

## V.

Finally, Evergreen contends the district court erred in concluding that Norfolk was entitled to limit its liability to Evergreen for damages under the Oil Pollution Act of 1990 (the OPA), 33 U.S.C. § 2704(a)(2). Evergreen's contention is without merit.

The OPA provides, *inter alia*, for limitation, *i.e.*, a cap, of a party's liability for damages for an oil spill in the navigable waters of the United States calculated upon the net tonnage of the vessel or vessels responsible for the spill. *Id.* However, a party's ability to benefit from a damages cap under the OPA is forfeited if an oil spill is "proximately caused by . . . the violation of an applicable Federal safety, construction, or operating regulation . . . ." *Id.* § 2704(c)(1)(B).

Evergreen argues that if we conclude on appeal that it had proven Norfolk violated a federal regulation such that it could invoke the Pennsylvania Rule, then we must also conclude that Norfolk is not entitled to benefit from a damages cap under the OPA. Because Evergreen failed to prove that Norfolk violated a federal regulation such that it could invoke the Pennsylvania Rule, *see* Part IV, *supra*, *a fortiori* it cannot prevail upon its argument that Norfolk is not entitled to a damages cap under the OPA.

## VI.

On cross-appeal, Norfolk contends the district court erred by finding it ten-percent at fault for the allision. The district court found Norfolk ten-percent at fault based upon its finding that Leverman Hewitt acted negligently in telling Pilot Swan: (1) that there was a "wide hole" between the dredging equipment; and (2) that the Didapper was "well over" on the red side of the channel. (J.A. 1298) (internal quotation marks omitted).

Norfolk makes two alternative arguments in support. First, Norfolk argues that Leverman Hewitt did not act negligently in describing the

locations of its dredging equipment, because his descriptions were accurate within his experience and such descriptions did not relieve Pilot Swan of his primary navigational duty to further inquire about the exact location of the Didapper if he had any concern as to its location. Alternatively, Norfolk argues that, assuming *arguendo* Leverman Hewitt failed to properly inform Pilot Swan of the location of the Didapper, the negligence of Pilot Swan was a superseding cause of the allision.

Each of Norfolk's arguments on this issue is without merit. Below, the district court found that the allision was caused by Pilot Swan's misapprehension of the location of Norfolk's vessels and equipment, particularly the Didapper. The district court attributed this mistake both to Norfolk's failure to provide an accurate description of the location of its vessels and equipment and to Pilot Swan's failure to use all means at his disposal to assess the risk. The district court allocated the major share of fault to Pilot Swan because he did not request more specific information from Leverman Hewitt and did not use his radar to determine the position of the equipment before it was visible. The district court also found that Norfolk had a duty to accurately convey the layout of its vessels and equipment; that Pilot Swan had a right to rely on this information; and that the actual description provided by Leverman Hewitt, on behalf of Norfolk, was misleading. Significantly, the district court also found that "Evergreen *did* take reasonable and timely action to avoid collision once the location of the equipment was known." (J.A. 1294 n.7) (emphasis added). As Evergreen correctly observes, Norfolk essentially asks this court to undo the district court's factual analysis of the comparative fault issues in its entirety.

There is simply no basis for us to conclude the district court's findings as just set forth are clearly erroneous. Moreover, with respect to the doctrine of superseding cause, the doctrine is inapplicable because it only applies when "the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (internal quotation marks omitted). Here, while the district court assigned a share of negligence to Pilot Swan, such negligence joined with, rather than superseded, Leverman Hewitt's negligence. As the district court found in a finding unchallenged on appeal, "Pilot Swan used all reasonably

appropriate means at his disposal to avoid collision with the DIDAP-PER and make the turn safely once the collision risk was obvious." (J.A. 1294 n.7).

In sum, there is no basis for us to overturn the district court's finding that Norfolk was ten-percent at fault for the allision.

## VII.

Lastly, in its cross-appeal, Norfolk argues that the district court erred by calculating its damages cap under the OPA based in part on the weight of the Didapper and the submerged dredge spoil pipeline. According to Norfolk, the calculation should have been made solely on the tonnage of the Dredge Charleston. Notably, however, Norfolk acknowledges that if we uphold the district court's finding that it was ten-percent at fault for the allision, its challenge to the district court's calculation of its damages cap under the OPA is moot, because the amount of damages for which the district court actually held it responsible is within a damages cap under the OPA based solely upon the tonnage of the Dredge Charleston. Indeed, because there is no basis for us to overturn the district court's finding that Norfolk was ten-percent at fault for the allision, *see* Part VI, *supra*, Norfolk's argument alleging the miscalculation of its damages cap under the OPA is moot.

## VIII.

For the reasons stated, we affirm the district court's judgment *in toto*.

*AFFIRMED*