PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM L. MARTIN, JR.,

    *Plaintiff-Appellee,*

v.

RICHARD O. HARRIS, in personam;
CHERYL P. HARRIS, in personam;
THE OIL SCREW FINTASTIC, OFFICIAL
NUMBER 587095, her engines,
equipment, tackle and apparel, in
rem,

    *Defendants-Appellants.*

No. 07-1610

Appeal from the United States District Court
for the Eastern District of North Carolina, at Elizabeth City.
Terrence W. Boyle, District Judge.
(2:05-cv-00019-BO)

Argued: September 25, 2008

Decided: March 11, 2009

Before NIEMEYER and AGEE, Circuit Judges, and
Richard L. VOORHEES, United States District Judge for
the Western District of North Carolina, sitting by
designation.

Affirmed as modified by published opinion. Judge Niemeyer
wrote the opinion, in which Judge Agee and Judge Voorhees
joined.

**COUNSEL**

**ARGUED:** Bryan K. Meals, MCGUIREWOODS, L.L.P., Norfolk, Virginia, for Appellants. Stevenson Lee Weeks, Sr., WHEATLY, WHEATLY, WEEKS & LUPTON, P.A., Beaufort, North Carolina, for Appellee. **ON BRIEF:** Jonathan H. Edgar, MCGUIREWOODS, L.L.P., Charlotte, North Carolina; William H. Baxter, II, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellants.

---

**OPINION**

NIEMEYER, Circuit Judge:

Shortly after 4:30 a.m. on May 31, 2002, before departing to sea from the Oregon Inlet Fishing Center in Cape Hatteras National Seashore Park, North Carolina, as Captain Richard Harris and Mate William Martin prepared the oil screw *Fintastic* for a fishing charter, Martin slipped and fell on fish slime and gurry, which had been left on the dock, injuring his back.[1]

Martin commenced this action against Richard Harris, Cheryl Harris, and the *Fintastic*, claiming that Richard Harris was liable to Martin in negligence under the Jones Act, 46 U.S.C. app. § 688(a) (2006) (now codified with minor changes at 46 U.S.C. § 30104(a)), and that the *Fintastic* was unseaworthy. After a bench trial, the district court found, on the Jones Act claim, that Harris was negligent in not keeping the dock around the *Fintastic* free of slime and gurry and that his negligence caused Martin's injuries. The court entered judgment against the defendants in the amount of $150,000, plus prejudgment interest. On the unseaworthiness claim, the court ruled against Martin out of a concern over whether the

---

[1]"Slime" is the secretion on the scales of fish designed to prevent infection, and "gurry" is the processing waste of fish, which can include slime.

unseaworthiness doctrine extended to the dock next to a vessel. From the district court's judgment, dated June 4, 2007, the defendants appealed.[2]

In his appeal, Harris contends that the district court erred (1) in finding the evidence sufficient under the Jones Act to hold him liable for Martin's injuries; (2) in declining to render a judgment on partial findings at the end of Martin's case, under Federal Rule of Civil Procedure 52(c); (3) in admitting into evidence a photograph of the dolphin fish catch laid out on the dock behind the *Fintastic*, taken on the evening before Martin's fall; (4) in awarding prejudgment interest on the Jones Act claim; and (5) in not reducing the damages award by the amounts that Harris paid Martin for maintenance and cure.

We conclude that the district court erred in awarding prejudgment interest on the Jones Act claim and vacate that part of the judgment, and we affirm the judgment as so modified.

I

In January 2002, William Martin went to work as a shipmate for Richard Harris, who was the charter captain, owner, and operator of the fishing vessel *Fintastic*. The *Fintastic* is a 50-foot vessel designed for charter-party fishing in the waters of the Atlantic Ocean off Cape Hatteras. In furtherance of his business, Captain Harris leased a slip from Oregon Inlet Fishing Center, and the lease agreement required Harris to keep the dock space surrounding the slip free of trash, litter,

---

[2]Because the district court entered judgment against all three defendants, all three have appealed. But in their brief, they address arguments only on behalf of Richard Harris because "[o]nly Richard Harris played any role in this case below." With respect to Cheryl Harris and the *Fintastic*, they state that they "join[ed] the arguments generally, and as specifically pertaining to Richard Harris, herein." For convenience, therefore, we refer to the defendants collectively as Harris, focusing, however, only on Harris' conduct.

debris, and other clutter, and to spray the boardwalk after a charter catch had been removed at the end of the trip. As Captain Harris expressed the duty, "They ask that every day after our fish are cleaned, or picked up by the fish cleaners, or the parties themselves dispose of the fish themselves, that we spray the dock off, keep it free of any slime."

Each morning Martin would arrive at the fishing center at approximately 4:30 a.m. to begin prevoyage preparation by loading ice on the vessel, releasing the lines to bring the vessel closer to the dock, and placing boarding stairs from the dock to the vessel to enable charter parties to board. At the end of the day, Martin would offload the day's catch onto the dock immediately behind the vessel and arrange the fish in a line so that a photographer could photograph the day's catch for use on the fishing center's website. After the photograph was completed, Captain Harris and Martin would clean the vessel and the dock. Harris normally cleaned the inside of the vessel and Martin, the outside. After the fish were removed from the dock, either Martin or Harris would hose the dock to wash away fish slime and gurry.

On May 30, 2002, Martin took the day off, and Keith Biggs served as Captain Harris' mate on the *Fintastic*. That day, the charter group caught approximately 30 dolphin fish. When the vessel returned to the dock, Biggs offloaded the fish and placed them on the dock behind the stern of the *Fintastic* for the customary photograph. After the photograph was taken, however, Captain Harris testified that he could not remember who then cleaned the dock off, if anyone.

The next day when Martin arrived at the *Fintastic* at 4:30 a.m. to prepare for the day's charter trip, he noticed that fishing lures and rods had been left out from the previous day and that the cockpit had not been washed down. There was sargassum—or offshore seaweed—in the fish box along with bags of ice and blood. Martin testified, "Just everything was left out from the day before." When Captain Harris arrived,

Martin told him about the vessel's condition, and Harris responded that Biggs had just gotten back from Florida and was more interested in socializing with his buddies up and down the dock than cleaning the vessel.

As Martin prepared for that day's trip, he untied the lines to move the vessel closer to the dock to enable him to lay down the temporary steps. As he walked on the dock near the stern of the vessel, he slipped on fish slime or gurry immediately behind the vessel, landing hard on his buttocks. Martin testified, "Both of my feet came out from under me and I slammed down on the dock on my tail bone." As the district court observed, "[b]ecause of the early pre-dawn hour and limited lighting, Martin could not see the slime as he worked." Martin said that he "got up as fast as [he] could and tried to shake it off," but he had pain, figuring that he had just bruised his tail bone. He also had slime "all over [his] backside," a fact that Captain Harris later observed while they were at sea. When Harris, who saw Martin fall, asked Martin if he was all right, Martin responded that he thought he was okay; he thought he had been bruised but could walk it off. But as the day progressed, Martin had difficulty doing his job because he was suffering significant pain in his back. When he complained to Harris about it, Harris told him not to perform his usual post-trip duties and to go home and rest.

Martin sought medical attention the next day, and his doctor instructed him to apply ice and take pain medication. The pain persisted over the days that followed, and Martin was given an MRI, which revealed that Martin had suffered a disc herniation at the L5/S1 level of the lower spine and that a fragment in Martin's spinal canal was causing pressure on his sciatic nerve. A neurosurgeon performed a microdiskectomy, which eased the pain in Martin's leg, but not in his back. Martin underwent physical therapy and, in October 2002, was injected with steroids. By November 2002, Martin was released by his doctor to return to work, but with limitations. His doctor recommended that Martin not return to work on a

fishing vessel but thought that Martin could engage in other work, provided he did not lift in excess of 30 pounds or bend frequently.

Martin incurred medical expenses totaling $25,539.32, all but $2,634 of which were paid by Harris as part of his cure obligation. Harris also paid Martin $8,000 for his maintenance obligation.

Martin commenced this action under the Jones Act for Harris' negligence in failing to provide a safe place to work and under general maritime law for the ship's unseaworthiness. After a bench trial, the district court found Harris liable to Martin under the Jones Act and awarded him damages in the amount of $150,000, plus prejudgment interest. In finding negligence, the court stated:

> On May 30, 2002, either Harris or his employee, Keith Biggs, had negligently failed to remove slime and gurry from the dock. The slime and gurry made for an unreasonably safe condition, which in turn caused Martin's slip and fall on May 31, 2002. . . .
>
> Harris's negligence both directly and proximately caused Martin's injuries. Martin suffered a disk herniation at the L4/L5 and L5/S1 levels of his spine, substantial physical pain and mental suffering, as well as permanent limitations. Martin additionally suffered a loss of earnings and diminished earnings capacity. These mental, physical and economic injuries entitle Martin to recover damages in the amount of $150,000 plus pre-judgment interest from May 31, 2002 until March 13, 2007, and post judgment interest from the date of this order until the judgment is satisfied.

From the district court's judgment, entered on June 4, 2007, the defendants filed this appeal.

## II

For his principal argument, Harris contends that the evidence was insufficient to support a finding of negligence and causation, as required for a violation of the Jones Act. He argues that "[t]he district court's factual finding is simply an impermissible inference based upon multiple inferences that this Court should not countenance." He notes particularly, "The district court committed 'clear error' when it impermissibly inferred the existence of fish slime on the dock from the previous day's catch. It inferred that the fish slime that caused Martin's fall was left there by the fish from the previous day's catch in the complete and total absence of any facts that suggest, let alone establish, that conclusion."

The Jones Act allows a seaman to recover for injury suffered during the course of his employment, providing:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.

46 U.S.C. app. § 688(a) (2006) (recodified in 2006 with minor changes at 46 U.S.C. § 30104, Pub. L. No. 109-304 § 6, 120 Stat. 1485, 1510 (2006)). The Jones Act expressly incorporates the "judicially developed doctrine of liability" of the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq. Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 436 (4th Cir. 1999) (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 439 (1958)) (internal quotation marks omitted). As such, the Act "gives seamen rights that parallel those given to railway employees under the FELA." *Id.*

To prevail on a Jones Act negligence claim against his employer, a seaman must show (1) that he is a seaman under

the Act; (2) that he suffered injury in the course of his employment; (3) that his employer was negligent; and (4) that his employer's negligence caused his injury at least in part. *Id.* To establish negligence by his employer, a Jones Act plaintiff must prove by a preponderance of the evidence that his employer "breach[ed] . . . a duty to protect against foreseeable risks of harm." *Id.* at 437. The employer's duty under the Jones Act "is to provide seamen with a safe place to work." *Estate of Larkins v. Farrell Lines, Inc.*, 806 F.2d 510, 514 (4th Cir. 1986) (citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 327-28 (1960)). And this duty extends from the vessel to the shore, provided the seaman is acting "in the course of his employment." *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 39, 43 (1943).

Although the elements of duty, breach, and injury draw on common-law principles, the standard of causation in a Jones Act negligence action is relaxed. *See Hernandez*, 187 F.3d at 436-37. Thus, an employer is liable if his "negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.* at 436 (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994)) (internal quotation marks omitted). But the standard must not be relaxed to the point that the Jones Act becomes in effect a workers' compensation statute. *See id.* at 436-37. "[T]he basis of liability under the FELA, and derivatively the Jones Act, remains grounded in negligence and not merely on 'the fact that injuries occur.'" *Id.* at 437 (quoting *Gottshall*, 512 U.S. at 543)).

In reviewing a district court's factual findings, we apply the clearly erroneous standard, viewing the evidence in the light most favorable to the appellee. *See Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008) (citing *Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc.*, 774 F.2d 648, 654 (4th Cir. 1985)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with

a definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotation marks omitted). In an admiralty case, questions of negligence, including causation, are factual issues and are thus reviewed under the clearly erroneous standard. *Id.* (citing *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 823 (4th Cir. 1992); *Ente Nazionale*, 774 F.2d at 654).

In this case, the district court found that Harris had a duty to provide Martin "with a safe place to work," *Estate of Larkins*, 806 F.2d at 514, and that this duty applied not only to the vessel, but also to the dock surrounding the slip where the vessel was moored, *see O'Donnell*, 318 U.S. at 39, 43. Moreover, under the lease agreement with Oregon Inlet Fishing Center, Harris was contractually obligated to keep the area behind his vessel free of trash and debris and to spray off the boardwalk after the charter party's catch had been removed. The court held that Harris breached this duty, finding that "[o]n May 30, 2002, either Harris or his employee, Keith Biggs, had negligently failed to remove slime and gurry from the dock," that "[t]he slime and gurry made for an unreasonably safe condition, which in turn caused Martin's slip and fall of May 31, 2002," and that "Harris's negligence both directly and proximately caused Martin's injuries." The court awarded Martin damages in the amount of $150,000.

In light of the record in this case, we cannot conclude that the district court's findings of negligence and causation were clearly erroneous. Construing the evidence in the light most favorable to Martin, we are not "left with a definite and firm conviction that a mistake has been committed." *Evergreen Int'l*, 531 F.3d at 308 (citation and internal quotation marks omitted).

First, the evidence supports the district court's finding that Harris breached his duty by negligently failing to remove fish slime from the dock. The court based this finding on the fol-

lowing facts. After the charter group returned with their catch on May 30, 2002, which amounted to approximately 30 dolphin fish, the catch was removed and placed on the dock at the stern of the *Fintastic*. Photographs of the catch confirmed this. And although it was the normal practice then to clean the vessel inside and out, as well as the dock, it was apparent the next morning, several hours later, that the normal practice had not been followed. When Martin arrived at 4:30 a.m. on May 31, 2002, he observed that lures and rods had been left out from the day before, that the back of the boat had not been washed down, that offshore seaweed remained in the fish box along with bags of ice and blood, and that rigs had been left out and various items were left on the countertop: "Just everything was left out from the day before." Harris himself testified that the vessel had not been properly cleaned, and he could not remember specifically if anyone had cleaned off the dock. When Martin said something about the vessel being left in a mess, Harris responded that mate Biggs was more interested in going up and down the dock talking to his buddies than doing his job. From these facts a court could find that slime and gurry that may have been on the dock were not removed by Harris or his mate.

The court could also reasonably find that slime was indeed on the dock and that Martin slipped on it. Martin slipped and fell at the stern of the vessel—exactly where the catch of dolphin fish had been placed the previous day—and when he got up from his fall, he had slime on his backside, a fact confirmed by Harris' own observation. Moreover, immediately after Martin fell, Harry Baum on the vessel *Rebait*, hollered at Captain Harris that he needed to keep his dock cleaner.

Finally, the district court could reasonably find that Harris' failure to clean the dock, or to ensure that his mate, Biggs, did so, resulted in slime being left on the dock—the same slime that caused Martin's fall and resulting back injuries. Harris himself recognized that fish have slime on them and therefore that after the catch is removed from the dock at the stern area

of the vessel, the dock must be hosed down to keep it clean of slime and gurry. If the dock had not been hosed down on the evening of May 30, 2002, after the catch was removed, as may be inferred from the condition of the vessel the next morning, it is not unreasonable to assume that the dock remained in the same condition overnight, until 4:30 a.m., especially when the *Fintastic* remained moored in its slip during that time. Under the relaxed standard of causation for Jones Act actions, the district court was not clearly erroneous in finding that Harris created the unsafe condition and that Martin injured himself as a result of that condition.

In short, viewing the evidence in a light most favorable to Martin, we conclude that the district court's findings of negligence, causation, and injury were not clearly erroneous.

Harris devotes a substantial portion of his brief to pointing to the absence of evidence that he had *notice* of the dangerous condition. Although notice might be a separately required element when some third party creates the dangerous condition, it is not required when Harris, or his agent Biggs, *created the unsafe condition*, as the district court found.

## III

Harris also contends that the district court erred in declining to grant his motion to render a judgment on partial findings, pursuant to Federal Rule of Civil Procedure 52(c), on the ground that "Martin failed to carry his burden of proving a prima facie case of negligence under the Jones Act." When Harris made the Rule 52(c) motion, the district court informed the parties that it was "disinclined to grant judgment as a matter of law on the case now" and deferred ruling on the motion until the close of the evidence.

Rule 52(c) gives the district court discretion to "decline to render any judgment until the close of the evidence." We cannot find that in this case the district court abused its discre-

tion, especially in light of our affirmance of the district court's factual findings of negligence.

IV

Harris next contends that the district court abused its discretion in admitting a photograph of the *Fintastic*'s dolphin fish catch, as laid out on the dock, taken on May 30, 2002, when Mate Biggs was substituting for Martin. Harris argues that the photograph was inadmissible because it was hearsay, lacked a foundation, and lacked proper authentication.

Harris, however, never objected to the photograph at trial. Indeed Harris' counsel presented evidence through questions directed to Harris about the photograph. Harris pointed out how the photograph showed that the dolphin fish were fresh because the photograph showed that the fins were sticking up and the color was good. Using the photograph, Harris also identified Biggs and the stern of the *Fintastic*, behind which the day's catch was laid out on the dock. And, using the photograph, Harris pointed out where Martin fell the next day. In these circumstances, Harris certainly waived any right to object to the photograph on appeal, especially where the grounds for his objection could have been obviated at the time through some preliminary questioning. *See* Fed. R. Evid. 103(a)(1).

In addition, the photograph had been listed as an exhibit in the proposed pretrial order, first served some 10 months prior to the trial and formally adopted as the pretrial order governing trial by the court on February 15, 2007. As required by Federal Rule of Civil Procedure 26(a)(3)(B), Harris did not timely object to the photograph. Although Harris did seek to amend the pretrial order to reflect his objection to the photograph after the 14-day period, Harris made no showing of good cause that would excuse his failure to object timely. The court never acted on the request, and the pretrial order

remained in the form adopted by the court, which included the photograph as an exhibit.

In these circumstances, Harris cannot now complain about the photograph's admission into evidence.

V

Harris contends that the district court erred in awarding Martin prejudgment interest in light of the Supreme Court's decision in *Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330, 336-39 (1988), which held that prejudgment interest is not available under the FELA. Martin argues, on the other hand, that the district court properly exercised discretion in awarding prejudgment interest because the Jones Act claim was brought on the admiralty side of the court, where prejudgment interest is generally awarded as a matter of discretion. *See Gardner v. Nat'l Bulk Carriers, Inc.*, 333 F.2d 676, 677 (4th Cir. 1964).

The Jones Act incorporates by reference the rights and remedies afforded railroad employees under the FELA. *See* 46 U.S.C. app. § 688(a); *Panama R.R. v. Johnson*, 264 U.S. 375, 391-92 (1924). And the Supreme Court has held that the Jones Act incorporates not only the statutory provisions of FELA, but also "the entire judicially developed doctrine of liability under the [FELA]," *Am. Dredging Co. v. Miller*, 510 U.S. 443, 456 (1994) (quoting *Kernan*, 355 U.S. at 439) (internal quotation marks omitted), which includes damages rules, *see Miles v. Apex Marine Corp.*, 498 U.S. 19, 32-33 (1990). In *Miles*, the Court incorporated into the Jones Act the "pecuniary limitation on damages" for loss of society in wrongful death actions, taken from its FELA decision in *Michigan Central Railroad Co. v. Vreeland*, 227 U.S. 59, 69-71 (1913). *Miles*, 498 U.S. at 32-33. Similarly in *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 156 (1964), the Court incorporated into the Jones Act its decision in *Chicago, Burlington & Quincy Railroad Co. v. Wells-Dickey Trust Co.*,

275 U.S. 161, 163 (1927), defining the class of potential bene-ficiaries to whom damages are payable.

Although the Supreme Court has asserted that the Jones Act would not automatically incorporate FELA jurisprudence, the Court has almost always incorporated FELA principles into the Jones Act unless the FELA principle is analytically limited to railroads or is otherwise inapposite to the sea. *See, e.g.*, *Cox v. Roth*, 348 U.S. 207, 208-09 (1955) (holding that the death of an employer would not defeat Jones Act claim even though FELA did not provide for survival actions against deceased tortfeasors because such an action is unnec-essary in the railroad context where employers are corpora-tions that never die); *The Arizona v. Anelich*, 298 U.S. 110, 123-24 (1936) (holding that FELA's assumption-of-risk rule tied to railroad-specific legislation did not apply under Jones Act); *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 377-78 (1932) (holding that a seaman had claim under Jones Act that he was injured because his employer negligently failed to furnish maintenance and cure even though railroad employers under FELA had no similar duty). But the avail-ability of prejudgment interest, *vel non*, is not a principle ana-lytically limited to railroads or to the sea, and therefore any FELA principle addressing prejudgment interest would be incorporated into the Jones Act under the specific directive in the Jones Act. *See* 46 U.S.C. app. § 688(a). Thus the holding in *Monessen* that prejudgment interest is not available in an FELA case is explicitly incorporated into the Jones Act.

In *Monessen*, the Court ruled that "the proper measure of damages [under the FELA] is inseparably connected with the right of action, and therefore is an issue of substance." 486 U.S. at 335 (alteration in original) (citation and internal quota-tion marks omitted). And the "proper measure of damages" under the FELA "includes the question whether prejudgment interest may be awarded to a prevailing FELA plaintiff." *Id.* Because Congress did not amend the FELA in the face of a virtual unanimity of court holdings over a period of more than

70 years that prejudgment interest is not available in FELA cases, the Court concluded that "[i]f prejudgment interest is to be available under the FELA, then Congress must expressly so provide." *Id.* at 339.

This substantive law of FELA is explicitly made applicable to Jones Act claims because the Jones Act provides that in such cases, "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees [*i.e.*, through the FELA] shall apply." 46 U.S.C. app. § 688(a); *see also* Michael F. Sturley & David C. Frederick, *Prejudgment Interest in Seamen's Personal Injury Cases: Supreme Court Precedent Lost in a Sea of Procedural Confusion*, 33 J. Mar. L. & Com. 423, 450 (2002).

Moreover, even though a Jones Act claim can be brought either at law or in admiralty, because the allowance of prejudgment interest is a substantive provision, the rule would be applicable regardless of whether the Jones Act case claim is brought at law or in admiralty. *See, e.g.*, *Panama R.R.*, 264 U.S. at 391 (holding that a substantive rule under the Jones Act would apply whether the action is at law or in admiralty), *McAllister v. Magnolia Petroleum Co.*, 357 U.S. 221, 224 (1958) (holding that the substantive rule regarding statute of limitations would apply "whether the action is at law or in admiralty, in the state or the federal courts"); *see also* Sturley & Frederick, *supra*, at 455. Thus, when *Monessen* held as a matter of substantive law that prejudgment interest is not available in FELA cases, it overruled *Gardner*, 333 F.2d 676, which had theretofore given district courts discretion to award prejudgment interest on Jones Act cases brought in admiralty.

The rule we recognize—that the FELA rule denying prejudgment interest is applicable in Jones Act cases—does not, however, affect the availability of prejudgment interest in other cases under general maritime law. *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195

(1995) (holding prejudgment interest generally should be awarded in maritime collision cases); *U.S. Fire Ins. Co.*, 966 F.2d at 828 (holding that in a collision case under general maritime law, "the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic" (citation and internal quotation marks omitted)).

Because prejudgment interest is not available under the Jones Act in light of *Monessen*, regardless of whether the Jones Act claim is brought at law or in admiralty, the district court erred in awarding such interest to Martin. Accordingly, we vacate that portion of the district court's judgment.

VI

Finally, Harris contends that the district court erred by not reducing the final judgment by amounts that he already paid Martin for maintenance and cure. Because amounts paid for maintenance and cure, however, are obligations that are not duplicated by the award of damages for breach of Harris' duty to provide Martin "with a place safe to work," we affirm the $150,000 damages award.

Under the general maritime law, a seaman is entitled to maintenance and cure at the expense of the vessel. Maintenance is the right to sustenance and unearned wages for the period from the onset of the injury to the end of the voyage; cure is the right to medical care until the seaman reaches the point of maximum cure. *See Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527-30 (1938); *see also Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 19 n.7 (1963); *Farrell v. United States*, 336 U.S. 511, 513-19 (1949). An award for maintenance and cure is independent of any recovery under the Jones Act. The obligation to pay maintenance and cure arises under maritime law *whenever* the seaman is injured, regardless of any negligence or fault on the part of the owner or employer. *See Calmar S.S. Corp.*, 303 U.S. at 527. And although there must be no duplication in the final award, *see Fitzgerald*, 374 U.S. at 19 n.6

(recognizing the potential overlap in recoveries under the Jones Act and the maintenance and cure claim and the need to avoid duplication of damages), maintenance is broader than, and thus not a substitute for, lost wages, *see, e.g.*, *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir. 1989).

In this case, Harris paid $31,305 to Martin for maintenance and cure, which included $8,000 for the remaining four months of the fishing season that Martin was unable to work after his injury and $23,305 for Martin's medical bills. These amounts, however, were not duplicated in the district court's award. The district court found:

> Martin suffered from a disk herniation at the L4/L5 and L5/S1 levels of his spine, substantial physical pain and mental suffering, as well as permanent limitations. Martin additionally suffered a loss of earnings and diminished earnings capacity. These mental, physical and economic injuries entitle Martin to recover damages in the amount of $150,000 plus pre-judgment interest.

Although the final judgment did include "loss of earnings," maintenance is not a substitute for lost wages. Nor did the final award include medical costs that were paid for by Harris as part of his cure obligation. As such, the district court did not err in not crediting Harris for amounts paid under his maintenance and cure obligation.

## VII

In sum, we affirm the district court's finding of liability under the Jones Act and its award of $150,000 in damages; we vacate the district court's award of prejudgment interest; and we affirm the judgment, as so modified.

*AFFIRMED AS MODIFIED*