**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1447

BEVERLY HEALTHCARE LUMBERTON,

Petitioner,

v.

MICHAEL O. LEAVITT, Secretary of the United States
Department of Health & Human Services; UNITED STATES
DEPARTMENT OF HEALTH & HUMAN SERVICES,

Respondents.

On Petition for Review of an Order of the United States
Department of Health & Human Services. (C-06-20; A-07-134)

Argued: May 13, 2009                    Decided: July 22, 2009

Before WILKINSON, MICHAEL, and MOTZ, Circuit Judges.

Petition for review denied by unpublished per curiam opinion.

**ARGUED:** Joseph L. Bianculli, HEALTH CARE LAWYERS, PLC,
Arlington, Virginia, for Petitioner.  Erica Cori Matos, UNITED
STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Atlanta, Georgia,
for Respondents.  **ON BRIEF:** Peter D. Keisler, Assistant Attorney
General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.;
Thomas R. Barker, Acting General Counsel, Dana J. Petti, Chief
Counsel, Region IV, UNITED STATES DEPARTMENT OF HEALTH & HUMAN
SERVICES, Atlanta, Georgia, for Respondents.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Beverly Healthcare Lumberton (Beverly) challenges civil money penalties (CMPs) imposed by the Centers for Medicare & Medicaid Services (CMS) for violations of the Medicare and Medicaid statutes and regulations. These penalties were sustained by an administrative law judge (ALJ), with minor adjustments, and affirmed by the Departmental Appeals Board (DAB) of the U.S. Department of Health and Human Services. Because we find no reversible error in the DAB's decision, we deny Beverly's petition for review.

I.

Beverly is a skilled nursing facility located in North Carolina that participates in both the Medicare and Medicaid programs. The North Carolina Department of Health and Human Services (the state survey agency), the agency in charge of surveying healthcare facilities that participate in Medicare and Medicaid, conducted a complaint survey against Beverly that ended August 4, 2005. The survey found that Beverly was not in substantial compliance with three requirements for participation in Medicare and Medicaid programs. Specifically, Beverly was found to have (1) failed to provide an environment free of abuse, in violation of 42 C.F.R. § 483.13(b); (2) failed to report and investigate allegations of abuse, in violation of 42

2

C.F.R. §§ 483.13(c)(2), (3); and (3) failed to develop and implement policies to prevent abuse of residents, in violation of 42 C.F.R. § 483.13(c).

These violations stemmed primarily from an incident that took place April 9, 2005, involving one of Beverly's residents, George Hunt[1]. Hunt was an 87-year-old man with a history of insomnia, falls, and dementia. Hunt had fractured his hip in a fall in December of 2004, which resulted in a physician ordering a soft safety belt to help restrain Hunt in his wheelchair. In the early morning of April 9, 2005, Hunt was sitting in his wheelchair at the nurse's station when he removed the soft waist restraint belt keeping him in the wheelchair and became combative with the two nurses at the station, Marilyn Marino and Octavia Taylor. Both nurses attempted to prevent Hunt from falling and to persuade him to relinquish the waist restraint, which he continued to hold. The nurses called a nursing assistant, Charles Robinson, to come and assist them because the nursing assistant who was present was too small to handle Hunt. While attempting to subdue Hunt, Robinson grabbed Hunt's right arm and tried to get the restraint out of Hunt's

_____

[1] The description of the incident by the ALJ and DAB was taken primarily from a nurse's note prepared by Nurse Marilyn Marino shortly after the incident. Because the complaint survey uncovered multiple complaints, the resident at issue here is sometimes referred to in the record as Resident #2, or R2.

3

left hand.  After Hunt pulled his arm away and refused to release the restraint to Robinson, one of the nurses asked Robinson to let go of Hunt's arm, and then managed to persuade Hunt to give up the restraint.  Robinson then "grabbed [Hunt's] arms roughly" while the nurses re-applied the restraint.  Admin. App'x A at 369; Admin. App'x B at 450.  After the restraint was back in place, Robinson released Hunt's arms, but Hunt then removed the restraint for a second time.  Robinson "then tried to grab [Hunt's] arms but [Hunt] started swinging at him." Admin. App'x A at 370; Admin. App'x B at 451.  At that point, Robinson "grabbed both of [Hunt's] wrists and would not let go." Admin. App'x A at 370.  Admin App'x B at 451.  Nurse Marino then suggested that Hunt needed to go to bed, as it was past midnight.  Robinson "angrily answered, 'He's not going to bed,'" and then wheeled Hunt to his room to clean and change him because he had become incontinent either before or during the incident.  Admin. App'x A at 370; Admin. App'x B at 451.

About ten minutes later, Robinson returned with Hunt, who had been cleaned and changed.  Hunt "appeared upset" and his "eyes were watery and his lips were quivering."  Admin. App'x A at 370; Admin. App'x B at 451.  Hunt then pointed to his wrist and said to Nurse Marino, "you broke my heart."  Admin. App'x A at 370, B at 451.  Nurse Marino observed redness and edema on Hunt's wrists three to four inches up his forearm, as well as

4

redness on his hand. Hunt told Nurse Marino that it hurt, and when she touched his wrist he pulled away and said "ow." Admin. App'x A at 370-71. When Nurse Marino returned the next morning (April 10), Hunt showed her his right arm, which had dark bruises on the wrist. Nurse Marino had begun preparing a nurse's note on the day of the incident, April 9, 2005, and completed the note on April 11, 2005. Robinson continued to work over the weekend and provided care to multiple residents, including Hunt, without further incident.

The Director of Nurses (DON) at Beverly, Roxanne Thompson, was not contacted on the date of the incident. Thompson learned of it when she came in to work on Monday, April 11, and she then reviewed the weekend incident log. That same day she began a routine investigation into the incident and received Nurse Marino's note. In a follow-up interview conducted by the North Carolina surveyor, Thompson said that had she been on duty at the time of the incident, Robinson would have been suspended immediately. Instead, Robinson was suspended on April 11 and subsequently terminated on April 14. However, Thompson's investigation ultimately concluded that Robinson had not abused the resident. Thompson finished her report and filed it with the state survey agency on April 12, 2005. She also filed a required "five day report" on April 15, 2005.

5

The complaint survey that concluded on August 4, 2005, also cited two other incidents. On March 22, 2005, a family member of another resident[2] at Beverly filed a grievance asserting that a nursing assistant had told the resident that she "better not turn the call light back on again" because the nurses were short staffed. Admin. App'x A at 394; Admin. App'x B at 465. The action was documented on April 8, 2005, and the five day report was filed on May 24, 2005. By that time, the nursing assistant involved in the incident no longer worked at Beverly for unrelated reasons.

In the remaining incident, on April 8, 2005, a third nursing assistant was reported for yelling at a resident[3]. The nursing assistant involved was suspended on April 11, 2005, and terminated on April 14, 2005. A twenty-four hour report found in Beverly's files was undated and the five day report for the incident was dated April 19, 2005.

The state agency took no action on these initial reports. The citations at issue were instead issued by State Surveyor Patrick Campbell, who arrived at Beverly's facility on July 27, 2005, to investigate an unrelated complaint of

---

[2] This resident is referred to as Resident #1, or R1, in the record.

[3] This resident is referred to as Resident #3, or R3, in the record.

inadequate care. Campbell had been sent to investigate a complaint that involved care provided by his own sister, who was a nurse at Beverly's facility. This conflict of interest should have disqualified Campbell from proceeding with the survey, but the conflict was unknown to Beverly at the time. After reporting that he could not substantiate the complaint he was sent to investigate, Campbell proceeded, apparently of his own initiative, to begin a search of unrelated records at Beverly. In the course of that search, Campbell found Nurse Marino's note on the April 9 incident. Upon completing his investigation on August 4, 2005, Campbell cited Beverly for the three violations listed above, based primarily upon Nurse Marino's note and subsequent interviews.

The state survey agency then recommended that the Secretary of the U.S. Department of Health and Human Services (Secretary), through the Centers for Medicare & Medicaid Services (CMS), impose penalties against Beverly. CMS found that Beverly was not in substantial compliance with 42 C.F.R. §§ 483.13(b), (c), and (c)(2), (3) and that Beverly's violations constituted "immediate jeopardy" to its residents during the period from April 9 to April 14, 2005 (when nursing assistant

7

Robinson was terminated).[4]  As a result, CMS imposed a CMP of $3,050 a day for April 9 through April 14, 2005.  CMS also found a continuing violation, at a lower severity level, for which it imposed a CMP of $1,000 a day for April 15 through August 4, 2005.[5]  The daily penalties ceased accruing on August 4, when Beverly submitted a plan of action stating that all staff had been "in-serviced" on proper policy regarding abuse allegations. Beverly also stated that it had completed a review of all grievances between January 1, 2005, and August 4, 2005, to ensure they had all been reported and investigated.

Beverly requested a hearing, and the case was heard before an ALJ.  The ALJ sustained all of CMS's findings, with the sole exception that he applied the $3,050 CMP from April 9 through April 11, 2005, rather than through April 14, because he concluded that "immediate jeopardy" had ended once Robinson was suspended.  Beverly appealed to the DAB, which affirmed the ALJ's decision in its entirety.  On April 3, 2008, Beverly filed

---

[4]  Each deficiency is placed in one of four severity categories: (i) no actual harm with potential for minimal harm; (ii) no actual harm with potential for more than minimal harm that is not immediate jeopardy; (iii) actual harm that is not immediate jeopardy, and (iv) immediate jeopardy to resident health or safety.  42 C.F.R. § 488.404(b)(1).  Deficiencies are also classified as "isolated," "constitut[ing] a pattern," or "widespread."  Id. § 488.404(b)(2).

[5]  CMS also imposed other penalties not at issue here.

a petition to reopen the DAB's decision pursuant to 42 C.F.R. § 498.100, which the DAB summarily denied on May 2, 2008. Beverly then filed a petition for review in this court under 42 U.S.C. § 1320a-7a(e).

## II.

Beverly raises four challenges to the Secretary's imposition of CMPs. First, Beverly contends that the Secretary failed to establish any of the three alleged violations. Second, Beverly argues that the Secretary erred in his determination as to the level of non-compliance (immediate jeopardy). Third, Beverly asserts that the CMPs imposed are unreasonable. Finally, Beverly maintains that the DAB erred in overlooking the state surveyor's conflict of interest.

## A.

CMS's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a-7a(e). The Supreme Court has described "substantial evidence" in other contexts as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (National Labor Relations Act). CMS may impose CMPs (among other remedies) when it determines that a long-term care facility has failed to substantially comply with participation

9

requirements. 42 U.S.C. § 1395i-2(h)(2)(B)(ii) ("The Secretary may impose a civil money penalty in an amount not to exceed $10,000 for each day of noncompliance."); 42 C.F.R. 488.301 ("Noncompliance means any deficiency that causes a facility to be not in substantial compliance."). "Substantial compliance" is defined as a "level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301. We address each of the alleged violations in turn.

1.

Beverly was cited for violating 42 C.F.R. § 483.13(b), which prohibits abuse of residents. Facilities participating in Medicare and Medicaid programs are forbidden from using "verbal, mental, sexual, or physical abuse, corporal punishment, or involuntary seclusion." 42 C.F.R. § 483.13(c)(1)(i). See also § 483.13(b). The U.S. Department of Health and Human Services (USHHS) defines "abuse" as "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish." 42 C.F.R. § 488.301. The Secretary's interpretive guidelines state that a resident has been physically abused when (1) physical contact was made (2) that was intentional or careless, (3) there was resulting harm or a likelihood of physical injury, pain, or

10

death to the resident, and (4) there was a lack of reasonable justification for the contact. USHHS State Operations Manual at 6-4, available at http://www.michigan.gov/documents/mdch/bhs_ch6_mom_abuse_etc_223 590_7.pdf. There is a "presumption that physical abuse has occurred whenever there has been some type of impermissible or unjustifiable physical contact with a resident that has resulted in injury or harm to the resident." Id. The USHHS manual includes "squeezing . . . any part of the resident's body" as an example of potentially abusive treatment. USHHS State Operations Manual at 6-4. However, the manual also states that physical contact during care, comfort, or assistance is permissible when "the type of contact involved and the amount of force used are absolutely necessary in order to provide care." USHHS State Operations Manual at 6-5. When the contact occurs "in the course of attempting to restrain a resident's behavior in an emergency," it is permissible if "both the type of contact involved and the amount of force used are reasonably necessary in order to prevent that resident from injuring himself/herself, injuring another person, or damaging property." Id.

The ALJ's conclusion that Robinson's conduct amounted to abuse was based almost exclusively on Nurse Marino's note, which the ALJ found to be "the most complete and reliable account concerning the incident." J.A. at 301. The ALJ found

11

that Robinson treated the elderly resident in an "angry manner" that was "not accidental or necessary in providing care and services to the resident. In fact, it was intentional and retaliatory." J.A. 302. The ALJ also accepted Nurse Marino's description of the resident's physical injury. According to the ALJ, the only reasonable interpretation of Nurse Marino's note was that the incident constituted abuse. In making this finding, the ALJ chose not to credit later interviews in which nurses and nursing assistants who were involved, including Nurse Marino, said that they did not consider Robinson's conduct abusive. Beverly argues that the ALJ erred by disregarding evidence that conflicted with Nurse Marino's note, and the facility attempts to characterize Robinson's conduct as "poor technique," rather than abuse.

Beverly's arguments notwithstanding, we cannot say that either the ALJ's or the Secretary's decision was unsupported by substantial evidence. Nurse Marino's note, which was the most contemporaneous description of the incident, states that nursing assistant Robinson roughly handled an elderly resident in a manner the nurse found excessive. Robinson grabbed and held the resident's arms at least twice, and there is no dispute that this contact resulted in injury. While there is also evidence that cuts in Beverly's favor -- for instance, the Social Security Administration concluded that the abuse

12

allegation was unsubstantiated –- it was for the ALJ to make determinations in the proceeding before him as to the weight of evidence and credibility of witnesses. He chose to credit Nurse Marino's note over later statements, and that note alone, due to its thoroughness and proximity to the event, was sufficient to constitute substantial evidence of abuse.

2.

Beverly was also cited for violating 42 C.F.R. § 483.13(c)(2), which requires participating facilities to "ensure that all alleged violations involving mistreatment, neglect, or abuse . . . are reported immediately to the administrator of the facility and to other officials in accordance with State law." Further, facilities must promptly investigate all allegations of abuse and "[t]he results of all investigations must be reported to the administrator or his designated representative and to other officials in accordance with State law . . . within 5 working days of the incident." 42 C.F.R. § 483.13(c)(4). Under North Carolina law, facilities are required to file an initial "24-hour report" within twenty four hours of an alleged incident of abuse and also a "five day report" following a fuller investigation. 10A N.C. Admin. Code. 13D.2210(b), (d).

There is no doubt that Beverly failed to timely report each of the cited incidents. The twenty-four hour report for

13

the April 9, 2005, incident was filed on April 12 (two days late), and the five day report was filed on April 15 (one day late). The March 22, 2005, complaint was not documented until April 8 (sixteen days late), and its five day report was not filed until May 24 (two months late). The April 8, 2005, report of a nursing assistant yelling at a resident had an undated twenty-four hour report on file, but its five day report was not filed until April 19 (six days late). Thus, there was substantial evidence to support the ALJ's conclusion that Beverly had violated the reporting requirements.

Beverly asserts that the late reporting of the incident involving nursing assistant Robinson was not a violation because the allegations were ultimately unsubstantiated and because DON Thompson filed the reports within twenty-four hours and five days, respectively, of learning of the incident herself. Both arguments must fail. First, it is the <u>allegation</u> that triggers the responsibility to report. <u>Cedar View Good Samaritan</u>, DAB No. 1897, at 11 (2003). Even if the ALJ found there was no abuse, Beverly's failure to promptly investigate and report the allegation violated 42 C.F.R. § 483.13(c)(2) and 10A N.C. Admin. Code. 13D.2210(b), (d). Second, it is irrelevant that the DON did not learn of the incident for two days. The federal statute requires a report within five days of the <u>incident</u>, while the state statute

14

requires reports within one and five days of when the health care _facility_ (not a specific person) learns of the allegation -- which in this case occurred when the resident, Hunt, alerted Nurse Marino to his injury. See 42 C.F.R. § 483.13(c)(2); 10A N.C. Admin. Code. 13D.2210(b), (d). Thus, the time at which Thompson learned of the incident is irrelevant to the deadline for filing the required reports.

3.

Finally, Beverly was cited for violating 42 C.F.R. § 483.13(c), which states that facilities "must develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents." CMS found that Beverly had failed to follow proper procedures related to immediately reporting allegations of abuse against residents to the facility administrator. The ALJ found that Beverly had failed to follow its own procedures -- which provide that "any associate (employee) who suspects that a resident has been abused must immediately notify the executive director (administrator) and appropriate state agencies in accordance with law" -- by not timely reporting the three incidents outlined above. J.A. at 303. The ALJ further concluded that these failures to implement Beverly's own policies "indicate[d] a wider systemic problem in the facility," and that "the failure

to actually implement facility policy against abuse and neglect leaves residents at real risk for serious harm." J.A. at 308.

Beverly argues that the ALJ's determination is improper for three reasons. First, it asserts that its employees did not fail to follow procedure because the procedure is only triggered when someone actually suspects an abuse has occurred. This argument has little traction, however, because federal law requires Beverly's procedures to require investigation of all allegations of abuse, not just those that facility employees believe are legitimate. See 42 C.F.R. § 483.13(c)(2). Beverly thus violated § 483.12(c) either by not having adequate reporting policies or by having them and failing to follow them. Second, Beverly argues that it is pointless to punish the two-day delay in reporting the Robinson incident to the state survey agency because no one was working at the agency over the weekend. This misses the point, however, since Beverly's primary failure was the lack of reporting to the facility administrator and DON so that proper action could be taken. Instead, the DON did not learn of the incident for two days while Robinson continued to work at Beverly. Third, Beverly argues that the ALJ should not have concluded that the three incidents at issue constituted a systemic pattern, and contends instead that these were isolated incidents. We conclude, however, that Beverly's multiple failures to report

16

allegations of abuse over a short period, spanning roughly two months, amounted to substantial evidence on which the ALJ could properly base his finding of a systemic violation.

B.

Beverly claims that CMS's determination that the alleged violations amounted to "immediate jeopardy" was in error. In cases when a CMP is imposed, "CMS's determination as to the level of noncompliance . . . must be upheld unless it is clearly erroneous." 42 C.F.R. 498.60(c)(2). "Immediate jeopardy" is defined in the Code of Federal Regulations as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. Thus, "[a] finding of immediate jeopardy . . . does not require a finding of present harm, but also encompasses a situation that is 'likely to cause' harm." Hermina Traeye Memorial Nursing Home, DAB No. 1810 (2002).

Under the clearly erroneous standard of review, the ALJ reduced the length of the immediate jeopardy period by three days, concluding that it had ended on April 11, 2005, rather than April 14. We hold that this determination was itself not clearly erroneous. Both Nurse Marino and Nurse Taylor recognized that nursing assistant Robinson's actions at the very least might have constituted abuse. Yet the incident went

17

unreported for two days, during which time Robinson continued to work at Beverly and give care to the resident he had allegedly abused. The fact that no further harm occurred is irrelevant, as only the possibility of harm is required under § 488.301. CMS's determination, and the ALJ's reaffirmation, that the potential harm was serious is also not clearly erroneous. The record suggests that the resident was roughly handled by a nursing assistant, that the nursing assistant's actions may have been punitive and retaliatory, and that the rough handling resulted in obvious injury. It was not error for either CMS or the ALJ to find the potential for serious harm in Robinson's continued interaction with Beverly's residents.

C.

Beverly next claims that the CMPs imposed by CMS are unreasonable. Again, the Secretary's findings (via CMS) must be upheld if "supported by substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a-7a(e). Further, when a reviewing court concludes that the basis for imposing a CMP exists, it "may not . . . [r]eview the exercise of discretion by CMS . . . to impose a civil money penalty." 42 C.F.R. § 488.438(e)(2). Nor may a reviewing court reconsider any of the factors taken into account by CMS with respect to "the amount of the penalty." Id. at § 488.438(e)(3).

18

CMS can impose a CMP, not to exceed $10,000, for every day that a facility is found not to be in substantial compliance. 42 U.S.C. § 1395i-3(h)(2)(B)(ii). The appropriate CMP is split into two ranges depending on the severity of non-compliance. When immediate jeopardy is present, the daily CMP can range from $3,050-$10,000. 42 C.F.R. § 488.438(a)(1)(i). When there is no immediate jeopardy, but the deficiencies have either caused actual harm or have the potential for more than minimum harm, the daily CMP can range from $50 - $3,000. Having found the three deficiencies listed above, CMS imposed a CMP of $3,050 a day for April 9-14, 2005 -- the period for which it found immediate jeopardy -- and a CMP of $1,000 a day for April 15-August 4, 2005. The ALJ changed the $3,050 CMP so that it only ran from April 9 through April 11, 2005, based on his finding that immediate jeopardy ended when Robinson was suspended.

Because the $3,050 CMP for April 9 through April 11 is the minimum penalty under the immediate jeopardy classification, the CMP is reasonable as a matter of course once we have concluded that the "immediate jeopardy" classification is appropriate. It is also reasonable in duration because it covers only the period during which Robinson remained at work at Beverly. We also conclude that the $1,000 CMP for April 12 through August 4, 2005, is reasonable in both scope and

19

duration. The burden of proving that the CMP was unreasonable fell on Beverly, Coquina Ctr. v. Ctrs. for Medicare & Medicaid Servs., DAB 1860 at 32-33 (2002), yet Beverly made no specific argument on this point. Even if it had, however, the CMP still appears to be reasonable. It falls at the lower end of the allowable range for violations that have caused harm or threaten more than minimum harm, and we agree with the ALJ that the amount "served the purpose of driving the facility back into compliance." J.A. 312. Further, it was reasonable for this CMP to extend to August 4 because it was not until that day that CMS could say with certainty that Beverly's employees had been properly "in-serviced" and that there were no additional unreported allegations of abuse. Accordingly, the CMPs imposed by CMS were reasonable.

D.

Finally, Beverly argues that the DAB erred when it upheld CMS's conclusions by overlooking the fact that Surveyor Campbell completed his investigation at Beverly and testified before the ALJ despite a clear conflict of interest. While there is no doubt that Surveyor Campbell ignored an obvious conflict of interest in proceeding with the survey that resulted in the citations at issue, see 42 U.S.C. § 1395i-3(g)(1)(E)(2), this does not affect our analysis. First, "inadequate survey performance by a state does not -- (1) Relieve a [facility] of

20

its obligation to meet all requirements for program participation; or (2) Invalidate adequately documented deficiencies." 42 C.F.R. § 488.318(b). Further, as the DAB decision noted, the ALJ knew of the conflict of interest and could weigh the credibility of Surveyor Campbell's testimony accordingly. In fact, the ALJ explicitly stated that he was relying on evidence other than Campbell's testimony. Had Campbell been the government's only witness, perhaps the ALJ's decision would be in doubt, but under the circumstances there was substantial evidence to support the decision.

### III.

In sum, we conclude that CMS's determination that Beverly violated 42 C.F.R. §§ 483.13(b), (c), and (c)(2), (3) was supported by substantial evidence. We further conclude that CMS's finding of immediate jeopardy (as subsequently modified by the ALJ) was also reasonable, as were the CMPs imposed for the violations. Beverly's petition for review is therefore

<u>DENIED</u>.

21