**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1077**

LIBERTYWOOD NURSING CENTER,

              Petitioner,

       v.

KATHLEEN SEBELIUS, Secretary of the United States Department
of Health and Human Services,

              Respondent.

On Petition for Review of an Order of the Department of Health
and Human Services.  (A-11-106)

Argued:  December 4, 2012          Decided:  February 28, 2013

Before MOTZ, FLOYD, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Joseph L. Bianculli, HEALTH CARE LAWYERS, PLC,
Arlington, Virginia, for Petitioner.  Erin Stacey Shear, UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Atlanta,
Georgia, for Respondent.  **ON BRIEF:** William B. Schultz, Acting
General Counsel, Dana J. Petti, Chief Counsel, Region IV,
Christine Bradfield, Deputy Chief Counsel, Region IV, UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Atlanta,
Georgia, for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Libertywood Nursing Center is a skilled nursing facility, which provides care to Medicare and Medicaid beneficiaries in North Carolina. Libertywood appeals the final determination of the Secretary of the United States Department of Health and Human Services (DHHS) that imposed a civil monetary penalty for its failure to substantially comply with certain Medicare regulatory requirements. The Centers for Medicare and Medicaid Services (CMS), a division of the DHHS, made the initial determination that Libertywood was in noncompliance and assessed the civil monetary penalty. Thereafter, an Administrative Law Judge (ALJ) and the Departmental Appeals Board (DAB) upheld the determination and assessment. We have jurisdiction to consider this appeal pursuant to 42 U.S.C. § 1320a-7a(e) and 42 U.S.C. § 1395i-3(h)(2)(B)(ii). For the reasons that follow, we affirm.

I.

On August 27, 2009, Libertywood admitted Resident 2 to its facility. His admitting diagnoses included Parkinson's disease, chronic kidney disease, and progressive dementia. He was consistently disoriented and semi-ambulatory with the use of a wheelchair. Dr. Timothy Beittel, then the medical director for Libertywood and Resident 2's attending physician, wrote that Resident 2 had a history of problematic behavior, "including

2

hitting [and] groping staff [and] patients." A few days after being admitted, a Libertywood staff member made a notation in Resident 2's file stating that he engaged in "sexually inappropriate behavior towards female staff." The file also notes that on the same date that Dr. Beittel made a "Referral to Psychiatry and Psychologist." Dr. Beittel later testified, however, that Resident 2 did not receive psychotherapy due to his cognitive deficiencies.

According to Libertywood's Nurse's Notes, on September 6, 2009, "[Resident 2] rolled [his wheelchair] beside [Resident 5] and began fondling her left breast. [The] nurse moved him to [the] other side of [the] day area and will monitor." An hour and fifteen minutes later, another resident reported that "[Resident 2] returned to [Resident 5] and put his hand under a blanket on her lap. She stated [that] he was feeling [her] all over, around her diaper."

Thereafter, on September 8, 2009, a staff member wrote in the Nurse's Notes that "Resident [2] had [his] hand under [another resident's] clothing at supper." After this incident, there is a September 9, 2009, entry in Resident 2's Care Plan, which states that he "ha[d] become increasingly aggressive in seeking sexual relationships with others." To address the problem, the Care Plan lists fourteen methods of intervention, including, but not limited to, redirecting Resident 2 when he

3

displayed inappropriate sexual behavior, administering his medications and monitoring the side effects, evaluating his medications to ensure that they were effective in managing and decreasing his sexually inappropriate behavior, one-to-one monitoring, and "encourag[ing] [his] participation in activities to aide in distracting and preventing aggressive sexual behaviors."

On September 15, 2009, Resident 2 told another resident that "he wanted her for tonight." Subsequently, on September 20, 2009, the Nurse's Notes reflect that Resident 2 "wheels himself up to different female residents and tr[ies] to put [his] hands on their body[.] [W]hen ask[ed] to move away [he] goes to another female resident." According to the Notes, the staff member "spoke to [Resident 2] and told him not to be putting his hands on other residents." Resident 2 responded: "Well I guess I better go wash my hands since I touched everyone." He then went to his room and washed his hands.

A September 29, 2009, entry in the Nurse's Notes states that Resident 2 had been redirected six times when he was seen "attempting to be inappropriate with residents at different times." Then on October 6, 2009, a staff member wrote that Resident 2 "rolled up [b]ehind [a] female [resident] [r]eached over [her and] stuck his hand [d]own her shirt." The staff member moved him away from the female resident. According to

4

the Weekly Nurse Summary, he also grabbed a nurse's "[b]reast and [b]uttocks during shower" that same day.

On October 14, 2009, Resident 2 rolled up in his wheelchair to a female resident and asked, "[R]eady to go to bed?" Staff then removed him from the area. The Weekly Nurse Summary also notes that a staff member observed Resident 2 touching a female resident's breast on this date.

Then on October 17, 2009, Resident 2 went into Resident 1's room and "started fondling [her] on the breast and touching [her] on the vagina." Resident 1 informed Resident 2 that "she was married" and "don't do that[,] but Resident [2] continued[.]" Resident 1 had a disease that prevented her from defending herself. Resident 1 later stated that "she did not feel safe [at Libertywood]." The administrator subsequently ordered one-to-one supervision of Resident 2 from 9:00 AM to 8:00 PM each day and ordered the staff to make checks on him every fifteen minutes the rest of the time.

Nevertheless, on November 13, 2009, at 7:50 AM, before one-to-one supervision commenced, Resident 2 "[r]olled over to [a female resident] and had his hand up her shirt touching her [b]reast." A staff member removed him from the area and asked "him to quit touching other [r]esidents." Immediately thereafter, Libertywood changed the one-to-one schedule to begin at 7 AM and end when Resident 2 went to bed. Four days later,

5

on November 17, 2009, Resident 2 transferred to another nursing home.

Thereafter, the North Carolina Department of Health and Human Services, on behalf of CMS, completed a survey in response to a complaint that had been filed against Libertywood. The survey found that Libertywood was not in substantial compliance with certain Medicare requirements. Moreover, it revealed that the noncompliance posed immediate jeopardy to the residents' health and safety. Consequently, CMS imposed a civil monetary penalty of $3,700 per day for Libertywood's noncompliance from September 6, 2009, through November 17, 2009, and a $100 per day civil monetary penalty from November 18, 2009, until December 11, 2009.

Libertywood timely requested a hearing on CMS's determination. Thus, on September 30, 2010, an ALJ convened a hearing on the matter, after which she affirmed CMS's determination. In sum, the ALJ held that Libertywood "was not in substantial compliance with the Medicare program requirements, its deficiencies posed immediate jeopardy to resident health and safety, and the penalties imposed [were] reasonable." Libertywood subsequently appealed the ALJ's decision to the DAB, which affirmed the ALJ's decision in its entirety. Libertywood's appeal to this Court followed.

6

Libertywood raises three issues in its appeal: (1) whether there is substantial evidence to support the Secretary's final determination that it was not in substantial compliance with 42 C.F.R. § 483.25(h); (2) whether the Secretary's finding of immediate jeopardy is clearly erroneous; and (3) whether there was any basis for the duration of the per diem penalty after Resident 2 was transferred from its facility. Although Libertywood's Statement of Facts also incorporates a great deal of argument, we will address only those claims contained in the argument section of its brief. See Fed. R. App. P. 28(a)(9)(A) (requiring the argument section of the opening brief to contain the "appellant's contentions and the reasons for them.")

Pursuant to 42 U.S.C. § 1320a-7a(e), "[t]he findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)) (internal quotations omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.

1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

We will overturn an agency's conclusions in a case such as this only when we find those conclusions to be unreasonable. See Evans v. Sullivan, 928 F.2d 109, 111 (4th Cir. 1991). The existence of judicial review of agency findings, however, does not mean that "a court may displace [an agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

A.

Libertywood contends the Secretary's determination that it was not in substantial compliance with 42 C.F.R. § 483.25(h) is unsupported by substantial evidence. Pursuant to 42 C.F.R. § 483.25(h), a skilled nursing home facility participating in the Medicare program must ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." To determine whether a nursing home complied with § 483.25(h)(2), we "look[] at two factors: whether a risk of an 'accident' was foreseeable and whether the facility's response was adequate under the circumstances." Liberty Commons Nursing

8

& Rehab Ctr.—Alamance v. Leavitt, 285 F. App'x 37, 44 (4th Cir. 2008).

After the first incident on September 6, 2009, when "[Resident 2] rolled [his wheelchair] beside [Resident 5] and began fondling her left breast[,]" the nurse moved him and wrote that she would monitor him. But just one hour and fifteen minutes later, another resident reported that "[Resident 2] returned to [Resident 5] and put his hand under a blanket on her lap. She stated [that] he was feeling [her] all over, around her diaper." On this date, it became foreseeable that Resident 2 posed a threat to the health and safety of its female residents.

As noted above, there is a September 9, 2009, entry in Resident 2's Care Plan, which states that he "ha[d] become increasingly aggressive in seeking sexual relationships with others." The Care Plan lists fourteen methods to address the problem. But, from our review of the record, it appears that this plan generally was not followed. Instead, as the ALJ observed, it appears that between September 9, 2009, and October 17, 2009, Libertywood's staff's interventions consisted simply of separating Resident 2 from the resident he had just inappropriately touched and instructing him not to touch her again. The staff also occasionally conducted checks every fifteen minutes on Resident 2. As to encouraging Resident 2's

participation in activities, he spent just thirty minutes a day in occupational therapy.

After the October 17, 2009, incident when Resident 2 went into Resident 1's room and "started fondling [her] on the breast and touching [her] on the vagina," Libertywood began one-to-one monitoring from 9 AM to 8 PM, and checks every fifteen minutes at all other times. On November 13, 2009, however, at 7:50 AM, Resident 2 "[r]olled over to [a female resident] and had his hand up her shirt touching her [b]reast." Immediately thereafter, Libertywood changed the one-to-one schedule to begin at 7 AM and end at 8 PM.

We are of the firm opinion that there is substantial evidence to support the Secretary's final determination that, after the first inappropriate touching on September 6, 2009, the incidents that followed were foreseeable but Libertywood's responses were inadequate. It was not until the October 17, 2009, incident that Libertywood instituted any meaningful measures to control Resident 2's inappropriate sexual behavior, when it commenced one-to-one supervision. But, even then, it failed to require the one-to-one supervision at all times when Resident 2 was out of bed, although it was foreseeable that he might inappropriately touch the female residents without such supervision. In fact, he did just that on November 13, 2009.

Although Libertywood did not have the benefit of hindsight, it was required by the regulations to exercise insight and foresight. Unfortunately, however, there is little evidence that it exercised either. Therefore, because the risk that Resident 2 would continue his inappropriate behavior was foreseeable, yet Libertywood's response was woefully inadequate under the circumstances, we hold that the Secretary's determination that Libertywood was not in substantial compliance with 42 C.F.R. § 483.25(h) is supported by substantial evidence.

B.

Libertywood also argues that CMS's "immediate jeopardy" determination is clearly erroneous. Pursuant to 42 C.F.R. § 488.301, "[i]mmediate jeopardy means a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." In civil money penalty cases "CMS's determination as to the level of noncompliance of a[] [skilled nursing facility] or [nursing facility] must be upheld unless it is clearly erroneous." 42 C.F.R. § 498.60(c)(2). A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court considering all the evidence is "left with a definite and firm conviction that a mistake has been committed." Evergreen

11

Int'l, S.A. v. Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir. 2008).

Libertywood maintains that it was Resident 2's behavior, and not Libertywood's noncompliance with the applicable regulations, that caused any harm that might have occurred to the female residents. But, it was Libertywood's noncompliance with the governing regulations that made Resident 2's inappropriate behavior possible. Had Libertywood instituted adequate measures to control Resident 2's inappropriate sexual behavior, which was foreseeable, the behavior would not have continued.

Although it is true that only Resident 1 made a formal complaint about Resident 2's inappropriate behavior, stating that "she did not feel safe [at Libertywood]," Libertywood failed to conduct an investigation as to the degree of harm suffered by the other female residents whom Resident 2 inappropriately touched. As the ALJ noted, "[Libertywood] can hardly be allowed to benefit from such a disregard for the welfare of its vulnerable residents." Consequently, we decline to hold that the Secretary's determination of immediate jeopardy is clearly erroneous.

12

Finally, Libertywood maintains that there was no basis for the duration of the per diem penalty that CMS assessed after Resident 2 was transferred from Libertywood. Libertywood bears the burden of proving that the civil monetary penalty was unreasonable. See Beverly Healthcare Lumberton v. Leavitt, 338 F. App'x 307, 316 (4th Cir. 2009).

As a preliminary matter, Libertywood asserts that the Secretary erred in placing on it the ultimate burden of persuasion to establish that it was in substantial compliance with the applicable regulations after Resident 2 was discharged. Specifically, Libertywood complains that instead of placing the ultimate burden of persuasion on it to establish that it is in compliance, see Hillman Rehab. Ctr. v. Health Care Fin. Admin., DAB No. 1611 (1997), the burden should be on the Secretary to demonstrate that the facility is in noncompliance with the governing requirements. We decline to reach this issue. Simply stated, Hillman is applicable "only if evidence [is] in equipoise." Harmony Court v. Leavitt, 188 F. App'x 438, 440 (6th Cir. 2006). As we discuss herein, there is substantial evidence to support the Secretary's finding of noncompliance in this case.

Again, pursuant to 42 C.F.R. § 483.25(h)(2), a skilled nursing home facility participating in the Medicare program must

13

ensure that "[e]ach resident receives adequate supervision and assistance devices to prevent accidents." Failure to do so may result in a civil monetary penalty, which CMS may impose for each day that the facility fails to be in substantial compliance with the applicable regulatory requirements. See 42 C.F.R. §§ 488.430(a), 488.440(b). There are two ranges of these penalties, depending on the severity of noncompliance. With a finding of immediate jeopardy, CMS may impose a daily civil monetary penalty from $3,050-$10,000. Id. at § 488.438(a)(1)(i). When there is no immediate jeopardy, but the deficiencies have either caused actual harm or have the potential for more than minimum harm, the daily civil monetary penalty can range from $50-$3,000. Id. at § 488.438(a)(1)(ii).

As noted earlier, CMS imposed a civil monetary penalty in the amount of $3,700 per day beginning on September 6, 2009, and continuing until November 17, 2009. CMS also levied a $100 per day civil monetary penalty from November 18, 2009, until December 11, 2009. Libertywood argues that there is no basis for the civil monetary penalty that CMS imposed for November 18, 2009, to December 11, 2009.

"[O]nce a facility has been found to be out of substantial compliance, it remains so until it affirmatively demonstrates that it has achieved substantial compliance once again." Premier Living & Rehab Ctr. v. Ctrs. for Medicare & Medicaid

14

Servs., DAB 2146, at 23 (2008). To establish that a facility has returned to substantial compliance with the governing regulations, a resurvey is generally required. See 42 C.F.R. § 488.454(a)(1). Although 42 C.F.R. 488.454(e) provides that a facility can demonstrate that it is in substantial compliance at an earlier date than a resurvey, to do so it must "supply documentation acceptable to CMS or the State survey agency that it was in substantial compliance and was capable of remaining in substantial compliance." Id. at § 488.454(e).

Here, the resurvey occurred on December 29, 2009, and found that Libertywood was "in substantial compliance [with the participation requirements] as of December 11, 2009." Libertywood failed to provide any acceptable documentation that it was in substantial compliance before that date. As such, we are unable to say that it was unreasonable for CMS to assess the per diem penalty after Resident 2 was transferred from Libertywood.

III.

When the record is considered as a whole, there is substantial evidence to support the Secretary's final determination that Libertywood was not in substantial compliance with the Medicare program requirements, its deficiencies posed immediate jeopardy to its residents' health and safety, and the

15

duration of the penalties imposed were reasonable.  Accordingly, we affirm the Secretary's final determination on these issues.

<u>AFFIRMED</u>