**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-2221**

───────────────

PENNY JO BARNETT, Individually and as the Personal Representative of the Estate of Edward Barnett,

Plaintiff – Appellant,

v.

UNITED STATES OF AMERICA,

Defendant – Appellee.

───────────────

Appeal from the United States District Court for the District of South Carolina, at Charleston.  David C. Norton, United States District Judge.  (2:20-cv-02517-DCN)

───────────────

Argued:  November 1, 2024                    Decided:  March 19, 2025

───────────────

Before WILKINSON, QUATTLEBAUM, and HEYTENS, Circuit Judges.

───────────────

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wilkinson and Judge Heytens joined.

───────────────

**ARGUED:** Jordan Christopher Calloway, MCGOWAN, HOOD, FELDER & PHILLIPS, LLC, Rock Hill, South Carolina, for Appellant.  Anne Murphy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Brooklyn A. O'Shea, Christopher J. McCool, O'SHEA LAW FIRM, LLC, Charleston, South Carolina, for Appellant.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Charles W. Scarborough, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Adair Ford Boroughs, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.

QUATTLEBAUM, Circuit Judge:

This appeal arises from a tragic boat accident. While navigating a coastal river on his way back from a job site, the boat Edward Barnett was driving crashed into a dike located on the side of the river. Both he and his coworker died in the crash. His widow, Penny Jo Barnett, sued the Coast Guard, alleging that its failure to properly maintain certain navigational aids installed to warn mariners of the dike's presence caused the crash. However, after a bench trial, the district court ruled for the Coast Guard. It found that, under the discretionary function exception to the Suits in Admiralty Act (the "SIAA"), the Coast Guard was immune from Barnett's allegations that it should have improved the navigational lights on and around the dike. And for the allegation that the Coast Guard failed to repair the only light on the dike that was not working, the court held such failure did not breach the Coast Guard's duty to repair broken aids to navigation in a reasonable time and to not mislead boaters. Lastly, the district court concluded that Mr. Barnett's own actions were the sole proximate cause of the accident.

We affirm the district court's judgment. The court properly applied the discretionary function exception to Barnett's arguments regarding brightness, flash sequence and background lighting. No statute, regulation or policy of the Coast Guard required it to take any specific action to alter or improve these navigational aids. Likewise, the record supports the district court's finding that Mr. Barnett departed from the navigable channel, chose not to use a chart plotter or post a proper lookout and traveled up the Cooper River at a high rate of speed during this nighttime voyage. As a result, we find no reversible error

2

in the district court's findings that the Coast Guard neither breached any duty it owed under a maritime negligence theory nor caused the crash.

## I.

Just before midnight on July 6, 2018, several Moran Environmental Recovery workers completed a job on the Cooper River, a tidal waterway near Charleston, South Carolina.[1] They then left the job site in two boats to return to Moran's dock on the same river. Edward Barnett drove one boat—known as the Miss June—with a fellow crew member on board. Robert Murphy and Andrew Quattlebaum drove the other.

To return to the Moran dock, the two boats traveled north up the Cooper River, away from the ocean. They eventually approached the "Daniel Island Bend," where the river curves to the left in a northwestern direction. J.A. 88. At the beginning of the bend, a dike is located on the left side of the river. Built by the Army Corps of Engineers in the 1950s, the dike is 725 feet long and marked by multiple warning lights. The outermost light—the light furthest into the Cooper River—is attached to the end of the dike. Called "ATON 49-A,"[2] it is a "20-foot-tall tower" with a green light atop it "charted to flash at four-second intervals." J.A. 87. "To the left of ATON 49-A are three yellow lights marking the [] dike as a hazard." J.A. 89. Each of these yellow, or "amber," lights are "200 to 225

---

[1] We draw the facts in this opinion from the parties' stipulations as well as from trial testimony and the district court's factual findings that are not in material dispute.

[2] The acronym "ATON" stands for "Aids to Navigation." J.A. 86.

3

feet apart, with the most westerly light [the one closest to the shore] 130 feet . . . from the shoreline where the rocks jut out and the actual dike begins." J.A. 89.

In addition to the amber lights physically on the dike, color-coded navigational lights mark the perimeter of "the navigable channel." J.A. 87. The navigable channel "is roughly forty-five feet deep and has no obstructions." J.A. 87. Green or red lights—depending on the side of the channel on which they sit—delineate the right and left sides of the channel. Green lights mark the port,[3] or left, sides of channels, and red lights mark the starboard, or right, sides of channels. 33 C.F.R. § 62.45(b)(1)–(2). The lights are color-coded based on an assumption that the vessel is "traveling upriver," meaning away from the ocean. J.A. 88; *see also* 33 C.F.R. § 62.21(e). That's why many kids who grow up boating in coastal waters are taught the phrase "red right returning," which means red markers are on your right as you return from the ocean. J.A. 88; *see also Bearce v. United States*, 614 F.2d 556, 561 n.8 (7th Cir. 1980).

Here, both ATON 49—a "buoy, floating eight to ten feet over the surface of the water" with an attached flashing green light—and ATON 49-A, attached to the dike itself with a flashing green light, marked the left side of the navigable channel in the Cooper River for a boat travelling upstream from the ocean. J.A. 87. ATON 49 was located "slightly southeast of the [] dike." J.A. 88. In other words, a boater proceeding upriver would pass

---

[3] To remind readers of other maritime jargon, "bow" refers to the front of a boat, "stern" refers to the back, "starboard" refers to the right side and "port" refers to the left, as oriented toward the bow. J.A. 93–94.

ATON 49 on their left first, and then ATON 49-A. ATON 48-A—a similar buoy with a red flashing light attached—marked the right side of the navigable channel.

Additionally, at the Daniel Island Bend section of the Cooper River, range lights sit atop two towers—ATONs R16 and 38-R—located on the eastern shore of the river but upriver from the dike. If the lights on those two towers are aligned, and a boat is proceeding upstream, the driver can be assured that he is in the river's navigable channel.

The map below shows the Daniel Island Bend and identifies the location of the dike and the various navigational aids pertinent to this case. As shown by the arrows on the map, the Miss June was traveling upriver, or north, toward the Daniel Island Bend at the time of the crash.[4]

---

[4] The annotations on this map were made by a trial witness who testified as to the location of the various aids to navigation. While the parties dispute many of the issues surrounding the crash, the location of the aids to navigation is not one of them. A non-annotated version of this map is located at J.A. 2481, and an explanation of the witness's markings as they were being made is located at J.A. 511–22.



As it rounded the Daniel Island Bend, the Miss June crashed[5] into the dike on the left side of the Cooper River. At the time of the crash, the Miss June was traveling at roughly 34 miles per hour. The throttles on the Miss June were found to be "in the wide-open position." J.A. 93. The boat was destroyed. And tragically, both Mr. Barnett and his crew member were found dead "in the stern or back of the Miss June," where they were thrown by the force of the collision. J.A. 93–94.

The dike Mr. Barnett crashed into is located to the left of ATONs 49 and 49-A. So, it is outside of the navigable channel. Reinforcing this, at the time of the crash, the green

---

[5] The technical maritime term for a crash with a stationary object is "allide" or an "allision." *See CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 589 U.S. 348, 351 n.1 (2020) (quoting Black's Law Dictionary 94 (11th ed. 2019)). But we use common parlance instead.

navigation aids were on the starboard side of the boat. In other words, the aids that mark the left side of the navigable channel were on the right side of the boat, meaning that the Miss June had exited the navigable channel to the left and crossed past the green ATONs before it crashed into the dike.

At the time of the crash, the amber light marking the part of the dike closest to the shore was not working. But the other lights marking the dike's location were.

Prior to the crash, Mr. Barnett had navigated this same stretch of river many times. He had completed over 500 jobs for Moran, nearly half of which were at night. Additionally, the Miss June had an onboard "GPS chart plotter" which would have shown Mr. Barnett where his boat was in the river and that he had left the navigable channel. J.A. 90, 581–82. But Mr. Barnett was not using the plotter on the night of the crash. And he did not properly post a lookout the night of the accident, either.

## II.

Mr. Barnett's widow, Penny Jo Barnett, brought negligence claims against the United States under the SIAA, claiming the Coast Guard breached its duty to maintain, repair and upkeep the navigational lights on and around the dike. According to Barnett, the navigational lights were too dim or had improper flash sequences. She also maintained that background lighting from nearby development obscured the lights. As a result, Barnett claimed that the lighting scheme did not properly warn mariners of the danger posed by the dike. Finally, she alleged the Coast Guard's failure to maintain and modify the lights caused the accident that killed her husband.

7

After a three-day bench trial, the district court ruled against Barnett. First, the district court concluded that under the SIAA's discretionary function exception, the United States was immune to Barnett's "negligence claims relating to background lighting, flashing rhythms, or candela, and they [were] barred under sovereign immunity." J.A. 100. In reaching this conclusion, it explained that federal law affords the Coast Guard broad discretion "in establishing [] navigational lights . . . ." J.A. 99. However, the district court also held that "once an aid to navigation is established and charted, it should remain lit since mariners will rely on its presence to navigate their vessels." J.A. 101. Thus, the district court found that the United States was not immune from Barnett's claim as to the government's failure to maintain the shoremost light on the dike. Even so, the court held that failure to maintain did not breach the Coast Guard's duty to maintain the dike's lighting system because all the other lights on the dike were working. The court reasoned that the one malfunctioning light could not have misled boaters "to believe 'there was safe passage between the light . . . and the land.'" J.A. 108 (quoting *Magno v. Corros*, 630 F.2d 224, 229 (4th Cir. 1980)). The district court also found that the "alleged failure to maintain the aid to navigation closest to shore on the dike did not proximately cause Miss June's allision with the middle to far side of the dike." J.A. 109. Instead, the court found that Mr. Barnett's own negligent operation of the Miss June caused the allision. This appeal followed.[6]

---

[6] We have jurisdiction over this maritime tort action under 28 U.S.C. § 1291.

8

**III.**

Barnett contends that the district court erred in (1) applying the SIAA's discretionary function exception; (2) concluding that the Coast Guard did not breach its duty with respect to maintenance of the lighting around the dike; and (3) holding that Mr. Barnett's negligence was the sole cause of the accident. As explained below, we disagree.

**A.**

To begin our discussion of this issue, we start with some background on suits brought under the SIAA. "[T]he United States, as sovereign, is generally immune from suits seeking money damages." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). That means such suits are barred unless the United States has expressly consented to be sued or, said differently, has waived its immunity. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). And the SIAA waives the United States' sovereign immunity "[i]n a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained . . . ." 46 U.S.C. § 30903(a).

But that waiver is not absolute. Like many other courts, we have held that the SIAA contains "a discretionary function exception."[7] *McMellon v. United States*, 387 F.3d 329, 343 (4th Cir. 2004) (en banc) (collecting cases). This discretionary function exception is ultimately grounded in separation-of-powers concerns. *Id.* at 341–43. Under it, "judicial

---

[7] "[T]he scope of the discretionary function exception under the SIAA should mirror that of the [Federal Tort Claims Act]," and FTCA cases should be guides for how SIAA cases should be resolved. *McMellon*, 387 F.3d at 349.

9

second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through tort actions is not permitted. *Id.* at 342 (quoting *Tiffany v. United States*, 931 F.2d 217, 276 (4th Cir. 1991)); *see also id.* at 351 ("A failure to recognize *any* discretionary function would allow the deterrent effect of tort liability in those very areas where Congress has mandated an active executive role . . . [and] the executive branch would be profoundly impaired in carrying out the very functions that Congress has assigned to it.") (Wilkinson, J., concurring).

Importantly, a plaintiff "bear[s] the burden of proving that the discretionary function exception does not apply . . . ." *Indem. Ins. Co. of North America v. United States*, 569 F.3d 175, 180 (4th Cir. 2009). To make that showing, a plaintiff must first establish that the conduct at issue does not "involve[] an element of judgment or choice." *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 184 (4th Cir. 2015) (quoting *Berkovitz v. United States,* 486 U.S. 531, 536 (1988)); *see also Indem. Ins. Co.*, 569 F.3d at 180. *Indemnity Insurance Co.* illustrates how this first requirement works. There, we explained that the Coast Guard had discretion in deciding what kind of "stability proof test" to use on a pontoon vessel because the applicable Marine Safety Manual said certain tests were "recommended" but not required. *Indem. Ins. Co.*, 569 F.3d at 180–81. In contrast, we clarified that "[t]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow because the employee has no rightful option but to adhere to the directive." *Id*. at 180 (citation and internal quotation marks omitted). So, we ask whether the source of the alleged obligation imposes

10

a specific course of action or whether it leaves the appropriate course of action to the Coast Guard.

Any parent will understand this distinction. If you tell your teenage son to be home by 11:00 PM, he has no discretion—he must follow a specific course of action. On the other hand, if you tell your teenage daughter to be home by a reasonable hour, you did not require a specific course of action; she has discretion about what is a reasonable time to be home.[8]

Barnett claims that the discretionary function exception does not apply to the Coast Guard's choices regarding brightness, flash sequence and general perceptibility of the amber lights on the dike, as well as ATONs 49 and 49-A. According to Barnett, 33 C.F.R. § 62.21(f)–(g)—which requires the Coast Guard to identify and correct discrepancies in aids to navigation—imposes non-discretionary duties as to "candela/flash sequence failures and [ATON] 49A/49 maintenance issues . . . ." Op. Br. at 15. She further asserts that "[d]iscrepancies" in aids to navigation "trigger" § 62.21(g)'s "duties to warn and take corrective action." Op. Br. at 15. In response, the government contends that "[s]ubsections 62.21(f) and (g) impose no mandatory duties, much less specific duties with respect to flash speed and brightness." Resp. Br. at 35.

The applicability of the discretionary function exception is a legal question that we review de novo. *See Butts v. U.S.*, 930 F.3d 234, 238 (4th Cir. 2019). In conducting that

---

[8] The references to a son and a daughter in this illustration are not intended to reflect gender stereotypes. It is possible, however, that they reflect the author's parenting experiences.

11

review, while Barnett relies on federal regulations to argue that the Coast Guard's conduct involved mandatory obligations instead of choices and judgments, we begin with the statutes that govern the Coast Guard generally. First, 14 U.S.C. § 102(3) requires the Coast Guard to "administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States[.]" Although that duty is mandatory, it is a broad directive. Aside from that, the statute imposes no mandatory implementing obligations. Or, to use *Indemnity Insurance Co.*'s language, it does not "specifically prescribe[] a course of action . . . ." 569 F.3d at 180.

Likewise, 14 U.S.C. § 541(a)(1) governs navigational aids. Under that provision, the Coast Guard is permitted—but not required—to "establish, maintain, and operate" "aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States." 14 U.S.C. § 541(a)(1). This provision doesn't mandate anything. It certainly doesn't define what is required to serve the needs of the armed forces and our nation's commerce. Instead, it leaves choices and judgments about what best serves those aims to the Coast Guard's discretion.

Finally, 14 U.S.C. § 544 states that "[t]he Secretary shall prescribe and enforce necessary and reasonable rules and regulations, for the protection of maritime navigation, relative to the establishment, maintenance, and operation of lights and other signals on fixed and floating structures in or over waters subject to the jurisdiction of the United States . . . ." Again, this provision does not mandate the content of the rules and regulations. It only states that the Coast Guard should do what it deems to be "necessary" and

12

"reasonable." § 544. What is necessary and reasonable, in turn, involves choices and judgments. Thus, Congress has imposed no mandatory duty on the Coast Guard to install aids to navigation in any particular place, or to alter or modify them once installed.

Turning next to the regulations, Barnett claims that 33 C.F.R. § 62.21 supports her arguments. But § 62.21(b) explains that "[t]he U.S. Aids to Navigation System is designed for use with nautical charts" which "portray the physical features of the marine environment, including . . . landmarks, and other aids necessary for the proper navigation of a vessel." Section 62.21(f) then states that "aids to navigation are maintained to a reasonable degree of reliability, [but] the rigors of the marine environment and various equipment failures do cause discrepancies on occasion." And § 62.21(g) provides that "[t]he Coast Guard makes reasonable efforts to inform the navigator of known discrepancies, and to correct them within a reasonable period of time, depending upon resources available."

We agree with the district court that these regulations do not impose mandatory duties concerning brightness, flash sequence or general perceptibility. Unlike the command to the teenage son to be home by 11:00 PM, they do not require the Coast Guard to ensure that an aid to navigation has a certain brightness level, nor do they state that an increase in background lighting over time creates a mandatory duty to change the aids to navigation to accommodate for that increase. Rather, like the instruction to the teenage daughter to be home by a reasonable time, they give the Coast Guard broad discretion to make choices

regarding when, where and how to establish aids to navigation and what characteristics those aids to navigation should have.[9]

Barnett persists by arguing 33 C.F.R. § 62.21(g)'s reference to correcting "discrepancies" imposes a mandatory duty to alter or update the lights' brightness, flash sequence and general perceptibility. She contends that lights that are too dim are just as dangerous as lights that aren't working. From a practical standpoint, she may have a point. But from a legal standpoint, the discretionary function exception does not permit us to ask whether the lights could be brighter or flash more prominently; it requires us to ask whether the condition of the navigational aids amounted to a "discrepancy." And nothing in the regulations and no authority Barnett cites indicates that the word discrepancy refers to a general obligation to improve the flash sequence, brightness or perceptibility of navigational aids. To the contrary, the Aids to Navigation Manual defines a "discrepancy" as a "[f]ailure of an aid to navigation to maintain its position or function as prescribed in

---

[9] Other regulations support the district court's conclusion. For example, 33 C.F.R. § 62.1(c) explains that "[t]he aids to navigation system is not intended to identify every shoal or obstruction to navigation which exists in the navigable waters of the United States, but rather provides for reasonable marking of marine features as resources permit." And § 62.45 provides that "[g]reen lights mark port (left) sides of channels and locations of . . . obstructions which are to be passed by keeping these lights on the port (left) hand of a vessel[,]" that red lights signify the same for "starboard (right) sides of channels[,]" and that yellow lights like the ones marking the dike in this case "have no lateral significance." § 62.45(b)–(c). Further, § 62.45(d) discusses "[l]ight rhythms" but does not mandate a specific flash rhythm. All of these regulations indicate the Coast Guard has broad discretion regarding navigational aids. And here, it complied with the regulations dictating which colors should be used to mark each side of the navigable channel.

the Light List."[10] J.A. 1430. That definition refers to a deviation from a specified position or function.[11] If, for example, the Light List says that a navigational aid is placed at a specific location, but the Coast Guard did not put it there, there is a discrepancy. Or if a light that is charted at a specific location is there but is inoperable, there is a discrepancy. But Barnett's claims do not involve navigational aids that were not placed where they were supposed to be; nor do they, except for one light on the dike closest to the shore, involve navigational aids that were not working. She claims instead that the Coast Guard should

---

[10] The Coast Guard publishes the Light List "to furnish more complete information concerning aids to navigation than can be conveniently shown on charts." J.A. 1924. It "includes all major Federal aids to navigation and those private aids to navigation that have been deemed to be important to general navigation, and includes a physical description of these aids and their locations." 33 C.F.R. § 62.21(c)(1). But importantly, the Light List itself states that "[m]ariners should realize that it is impossible to maintain every aid to navigation operating properly and on its assigned position at all times[]" and encourages mariners "who discover[] an aid to navigation that is either off station or exhibiting characteristics other than those listed in the Light Lists [to] promptly notify the nearest Coast Guard unit." J.A. 1927–28.

[11] That definition is consistent with the ordinary meaning of discrepancy at the time that 33 C.F.R. § 62.21(g) was first promulgated. *See* United States Aids to Navigation System, 52 Fed. Reg. 42639, 42641 (Nov. 6, 1987) (to be codified at 33 C.F.R. pts. 60, 62, 66, and 100); *see also Discrepancy, Black's Law Dictionary* (6th ed. 1990) ("A difference between two things which ought to be identical, as between one writing and another; a variance . . . Also discord, discordance, dissonance, dissidence, unconformity, disagreement, difference."); *Discrepancy, The New Collins Dictionary and Thesaurus* (1987) ("[A] conflict or variation, as between facts, figures, or claims"); *Discrepancy, The World Book Dictionary* (1987) ("[L]ack of consistency; difference; disagreement"); *Discrepant, Webster's Dictionary* (1987) ("[N]ot tallying; showing an inconsistency"); *Discrepancy, Webster's New World Dictionary of the American Language* (1987) ("[D]isagreement; inconsistency"); *Discrepancy, Webster's Dictionary of Modern English* (1987) ("[C]onflict, variation, as between figures"). Considering these dictionary definitions as a whole, "discrepancy" does not refer to a general duty of care or an open-ended obligation to improve or change something; instead, it refers to differences from an objective measure or point of comparison.

15

have altered the aids so that they would provide more effective warnings. That argument might work in traditional tort law. But here, where the Coast Guard has discretion to choose the characteristics of this lighting scheme, an alleged failure to "do better" does not constitute a discrepancy within the meaning of 33 C.F.R. § 62.21(g).

Barnett also argues that testimony from the trial indicates the Coast Guard recognized a duty to alter or update navigational aids to make them as safe as possible. In advancing this position, she cites testimony given by Dwayne Harris, a "recreational boating specialist" for the Coast Guard, whose job was to "go out and inspect aids" and "verify" them. J.A. 457, 459. Harris testified that his job required him to identify discrepancies—such as a difference between a light's "flash sequence" as he observed it with his own eyes while in his boat and what the Light List stated it should be—and notify the Coast Guard. J.A. 476, 487–88. But in explaining that responsibility, he said that his job was not to "look[] for danger" but to verify "[i]f a light's on or it's off and it's the right color and right sequence." J.A. 488. Harris' testimony indicates that a discrepancy is significant only to the extent that an aid to navigation is not working at all or is not functioning as it should based on specific criteria—such as whether a light is flashing at the correct sequence. As such, the testimony actually undermines Barnett's position.

Ultimately, Barnett has failed to show that the Coast Guard's challenged conduct involves mandatory obligations as opposed to discretionary choices. Indeed, the Coast Guard is permitted to make choices concerning changes to navigational aids. Thus, the Coast Guard's decisions regarding the brightness, flash sequence, and perceptibility of the

16

amber lights and ATONS 49 and 49-A satisfy the requirements of prong one of the discretionary function exception.

However, even if Barnett had satisfied the first requirement, she failed at the second. The second discretionary function exception requirement requires that a plaintiff show "that judgment is [not] of the kind that the discretionary function exception was designed to shield, *i.e.*, whether the challenged action is based on considerations of public policy." *Indemnity Ins. Co.*, 569 F.3d at 180 (quoting *Suter v. United States*, 441 F.3d 306, 311 (4th Cir. 2006)) (cleaned up). Importantly, this requirement is related to the first. "'[W]hen a statute, regulation, or agency guideline permits a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Id.* (quoting *Suter*, 441 F.3d at 311) (internal quotation marks omitted).

Barnett failed to raise any relevant arguments in her opening brief as to whether the actions or inactions of the Coast Guard that she challenges involve considerations of public policy. "A party waives an argument by failing to present it in its opening brief or by failing to 'develop its argument—even if its brief takes a passing shot at the issue.'" *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)) (internal quotation marks omitted). Thus, Barnett has waived the arguments on prong two that she attempts to make on reply.[12] And since Barnett

---

[12] Even if she had not waived these arguments, Barnett has not carried her burden to show that the challenged conduct does not involve considerations of public policy. "[W]hen a statute, regulation, or agency guideline permits a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Indem. Ins. Co.*, 569 F.3d at 180 (quoting *Suter*, 441 F.3d at 311 (internal

failed to show that the discretionary function exception did not apply, the Coast Guard

enjoys immunity from Barnett's claims about dimness, flash sequence and perceptibility.

That said, we also agree with the district court that the Coast Guard does not have

unfettered discretion regarding whether it will maintain the aids to navigation that it

establishes. The district court correctly held that 33 C.F.R. § 62.21(g) does not require aids

to navigation to have particular characteristics, but it does require the Coast Guard to

inform boaters of any known discrepancies and to fix those discrepancies "within a

reasonable period of time[.]"[13] 33 C.F.R. § 62.21(g). Thus, with respect to the inoperable

amber light closest to the shore, the Coast Guard did not have discretion regarding whether

---

quotation marks omitted)); *see also Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993) (stating that courts should "look to the nature of the challenged decision in an objective, or general sense, and ask whether the decision is one which we would expect inherently to be grounded in considerations of policy[]"). Because the Coast Guard's decisions to implement particular brightness and flashing patterns for the aids to navigation here were acts of discretion permitted by 33 C.F.R. § 62.21, those acts were presumptively grounded in public policy considerations. Barnett, who bears the burden of showing the inapplicability of the discretionary function exception, has not overcome that presumption. Further, the Coast Guard's decisions regarding whether and when to update or improve the dike's lighting scheme are certainly the sort of economic decisions that the discretionary function exception is designed to protect. *See McMellon*, 387 F.3d at 342–43; *see also Magno*, 630 F.2d at 229 (explaining that "it is usually inappropriate for a federal court to . . . in effect direct the Coast Guard how to spend its limited resources" and that "[e]very dollar of [Coast Guard] money that we direct it spend is diverted from another regulatory activity").

[13] Here, the district court found based on the Coast Guard's own stipulation that "the Army Corps did not conduct regular maintenance or inspections of the lights." J.A. 101. It also observed, relatedly, that "[t]he Coast Guard and the Army Corps have conceded that they have no discretion or choice but to comply" with 33 C.F.R. § 62.21(g), as well as "the Aids to Navigation Manual," and thus that they did not have discretion over whether to maintain the lights—meaning they did not have discretion over whether to ensure that a charted aid to navigation remained lit. J.A. 101. The government does not challenge this ruling on appeal, and we decline to upend this portion of its ruling sua sponte.

18

to timely repair that aid to navigation. For that reason, we agree with the district court's conclusion that the discretionary function exception does not apply to that portion of Barnett's arguments. So, the discretionary function exception bars all but the inoperable light component of Barnett's negligence claim—which we turn to now.

## B.

For conduct that is not immune under the discretionary function exception, "[t]he elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law . . . ." *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008) (citation and internal quotation marks omitted). Those elements are "a duty, a breach of that duty, proximate cause, and resulting injury." *Schumacher v. Cooper*, 850 F. Supp. 438, 453 (D.S.C. 1994); *see also* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 3:4, p. 94 (6th ed. 2018). And in a maritime negligence action, "when two or more parties have contributed by their fault to cause property damage in a maritime collision . . . liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault . . . ." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975).

## 1.

Barnett challenges the district court's analysis of duty and breach under maritime negligence with respect to the one inoperable light. The district court held that since only one of the dike's lights was not lit, and that light was the amber light closest to the shore, "the dike's extension into the river was well lit[.]" J.A. 108. It also held, relying on *Magno*,

19

that "[t]he failure of the light furthest from the clearly marked channel would not induce reliance, therefore, there would be no breach of duty." J.A. 109.

Like the district court, we have limited Barnett's negligence claim to the inoperable light arguments. Even so, she more broadly contends that the Coast Guard violated its duty to maintain the lighting system because the lighting system did not adequately "serve as a reasonable warning of the dike's presence." Op. Br. at 18. Barnett insists that the lighting scheme was "either inoperable, confusing, or imperceptible." Op. Br. at 21. According to Barnett, the amber lights "were not visible to boaters," and ATON 49-A should have been equipped with a "quick flashing light" instead of having a "4 second flash rhythm." Op. Br. at 18, 20. Finally, Barnett argues that the district court misapplied *Magno* because that case involved a plaintiff arguing that more lighting should have been installed, whereas this case involves "operational issues with components of the dike's *existing* lighting system." Op. Br. at 21. There are at least four problems with Barnett's arguments.

First, Barnett's arguments on this point run into our holding regarding the applicability of the SIAA. As already explained, the Coast Guard is immune from liability as to all arguments about all aspects of the lighting scheme save for Barnett's arguments about the shoremost amber light that was out.

Second, Barnett's broad arguments also conflict with Supreme Court guidance and our precedent. Starting with the Supreme Court, *Indian Towing Co. v. United States* involved a claim that the Coast Guard failed to repair a light it had installed on a lighthouse that was not working. According to the plaintiff, the light was out, which caused its boat to run aground on an island. 350 U.S. 61, 61–62 (1955). The Court held that the Coast Guard

20

had a duty to use "due care to discover this fact and to repair the light or give warning that it was not functioning." *Id.* at 69. It explained that when the Coast Guard exercises its discretion to install a navigational light, mariners should be able to rely on the light both being where it is charted and being operable. *Id.*

Almost 30 years later, in *Faust v. S.C. State Highway Department*, 721 F.2d 934 (4th Cir. 1983), we interpreted *Indian Towing* to require "no more than that the government not injure sailors or boaters by inducing reliance on misleading navigational aids." *Id.* at 939. And reiterating our earlier *Magno* decision, we explained that the Coast Guard could not be liable "for failing to provide additional lighting or marking on a dike" if the lighting it did provide on the dike was working and did not mislead boaters. *Id.* (citing *Magno*, 630 F.2d at 228).

No case in this circuit, nor any case that Barnett points to, stands for the broad proposition that the Coast Guard has a duty to alter or update a chosen lighting scheme absent a statutory or regulatory duty to do so. The cases we do have that impose duties under maritime negligence on the Coast Guard regarding chosen lighting schemes require it to make sure they are "kept in good working order," are repaired if they stop working, and do not lead boaters to believe that they can safely travel where they in fact cannot. *See Indian Towing*, 350 U.S. at 69; *see also Magno*, 630 F.3d at 228; *Faust*, 721 F.2d at 939.[14]

---

[14] Our precedent is consistent with other circuits'. *See, e.g., Chute v. United States*, 610 F.2d 7, 14 (1st Cir. 1979) (explaining that "*Indian Towing* does not invite, as plaintiffs would have it, an assessment of the appropriateness of the particular navigational aid established; liability was not imposed in that case because a more powerful light or taller lighthouse would have been a better warning . . . but rather because the negligent non-functioning of the charted lighthouse misled plaintiff to his detriment").

Neither *Indian Towing* nor our cases impose a duty on the Coast Guard to update and alter, rather than merely timely repair, aids to navigation that it otherwise has broad discretion to establish. The Coast Guard's duty—once it undertakes to establish aids to navigation—is (1) to maintain the aids in good working condition—e.g., to fix them when they break, not to update or improve them—and (2) not to mislead boaters.

Third, Barnett's argument that the lighting system is inoperable, confusing and/or imperceptible would require us to find clear error in the district court's factual findings. *See Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) (stating that we review "findings of fact . . . for clear error" and that we are not to "disturb the district court's factual findings if they are 'plausible in light of the record viewed in its entirety'"). Recall that the district court found that the middle and eastern amber lights on the dike were working and visible, as were the green aids to navigation that marked the end of the dike and the left side of the navigable channel. Barnett has not shown that these findings were erroneous at all, much less clearly so. We thus affirm the district court's factual findings that only the shoremost light was out, and that the center and east amber lights, as well as the green lateral aids to navigation, were working.

Focusing then on the inoperable light on the dike furthest from the navigable channel, did the fact that the shoremost light was not working breach the Coast Guard's duty under maritime negligence law? The district court addressed this very question, finding that "[t]he failure of the light furthest from the clearly marked channel would not induce reliance, therefore, there would be no breach of duty." J.A. 109. Importantly, breach

22

of duty is a question of fact, which we review for clear error. *See Martin v. Harris*, 560 F.3d 210, 217 (4th Cir. 2009) (holding that "[i]n an admiralty case, questions of negligence . . . are factual issues and are thus reviewed under the clearly erroneous standard"); *see also Ente Nazionale Per L'Energia Electtrica v. Baliwag Nav., Inc.*, 774 F.2d 648, 654 (4th Cir. 1985) (explaining that "we are compelled to review the district court's findings of fact, including its finding as to causation, under the clearly erroneous standard of Fed. R. Civ. P. 52(a)"). Once again, Barnett has not shown that this factual finding was clearly erroneous—a boater in the navigable channel had multiple, operable lights between the channel and the unlit light with which to navigate.

Fourth and finally, Barnett argues that in finding the one unlit light would not induce reliance, the district court improperly relied on *Magno*. According to Barnett*, Magno* is factually distinct from this case, and the district court was wrong to rely on it as it did. We disagree. *Magno* involves remarkably similar facts to this case, with the exception that the dike in *Magno* was lit with a single light affixed to the end of the dike, which "mark[ed] the dike" and also marked "the channel's eastern boundary," as opposed to the multiple lights that lit the dike here. *Magno*, 630 F.2d at 226. In *Magno*, we held that (1) "the Coast Guard undertook only to light the channel end of the dike with a light," which it successfully did, and (2) that there was no evidence "showing that the light somehow would induce a boater to believe that there was nothing between it and land."[15] *Id.* at 228. *Magno*

---

[15] Barnett also argues that the Seventh Circuit's *Callas' Estate v. United States* decision "provides a good example of how the reliance requirement" discussed in *Magno* and *Faust* can be proven. Op. Br. at 22. But *Callas' Estate* is factually distinct from this

23

is comparable to this case and counsels us that allegations of negligent maintenance cannot be used to argue that lighting schemes should be substantively changed or updated. That principle applies here, and our holding is much the same. With the exception of the light closest to the shore that was not working, the Coast Guard in this case lit the dike that it originally undertook to light, and it did not induce reliance on a misleading lighting scheme. The lighting scheme was not misleading because, even if it could have been brighter or more perceptible, it did not direct boaters to travel outside of the navigable channel. Since all other aids to navigation on and around the dike except for the one closest to shore were working, Mr. Barnett could not have been led to believe that there was nothing between the four working aids to navigation and land.

Summing up our decision on duty and breach, the duty to maintain is not a duty to alter or update aids to navigation so that they meet an undefined standard of effectiveness. Rather, it is a duty to repair navigational aids that are not working and not to mislead. Since all but one of the lights on the dike were indeed working, the district court did not reversibly

---

case. There, the government posted a sign that said "Danger-Keep away 00 Feet" and did not utilize any other warning lights near a portion of a boat lock and dam that had strong, dangerous currents. *Callas' Est. v. United States*, 682 F.2d 613, 618 (7th Cir. 1982). The Seventh Circuit held that the objectively misleading sign failed to inform boaters of the danger of the nearby backcurrent. *Id.* at 623. The sign was misleading because a boat keeping "00" feet away from the lock could still be in dangerous currents—and further because the sign "simply fail[ed] to specify the nature and source of the danger posed by the dam." *Id.* It also failed to "mark the limits of the restricted area as required by [] Army regulations." *Id.* Thus, *Callas' Estate* stands for the proposition that objectively misleading warnings that violate regulatory requirements—such as a sign that tells boaters to stay "00" feet away—"constitute[] negligence by the government." *Id.* No regulations required any particular lighting scheme here—only that the lighting scheme, once installed, needed to remain operational. And the sole unlit light here was not objectively misleading in the way that a sign saying to keep "00" feet away is. So *Callas' Estate* does not help Barnett.

24

err in finding that the unlit shoremost light could not have misled Mr. Barnett into believing that he could pass between the dike and the shore.[16] Accordingly, we affirm the district court's conclusion that the Coast Guard did not breach its duty to maintain the aids to navigation in this case.

**2.**

Barnett also challenges the district court's finding that she failed to establish that the Coast Guard caused the crash. The district court held that even if the Coast Guard's failure to maintain the shoremost amber light on the dike breached its duty to maintain the established aids to navigation, that failure did not proximately cause the crash. The district court instead ruled that Mr. Barnett was the sole cause of the accident. In reaching this decision, the court relied on Mr. Barnett exiting the marked navigable channel, driving at a high speed at night, not using his chart plotter, and failing to post a lookout, even though he had traversed this section of river hundreds of times before. "Generally, 'proximate cause' in the admiralty context is defined as 'that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened.'" *Ente Nazionale*, 774 F.2d at 655 (quoting *Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230, 233 (5th Cir. 1969)) (internal quotation marks omitted). And

---

[16] In fairness, our precedent's inclusion of duty not to mislead as part of maritime negligence, to an extent, blends causation-esque concepts into the duty analysis. While perhaps conceptually confusing, we are simply following our precedent here. *See Faust*, 721 F.2d at 939.

25

causation is a factual issue that we review for clear error. *See Martin*, 560 F.3d at 217. Given the facts on which the district court relied, Barnett cannot meet that standard.[17]

Resisting that conclusion, Barnett argues that the district court's improper determination that the discretionary function exception applied to most of the Coast Guard's decisions as to the lighting scheme on and around the dike meant the court did not consider other Coast Guard conduct that should have been part of its causation analysis. Barnett contends that when the Coast Guard's failure to ensure the lights had the proper brightness, flash sequences and general perceptibility is evaluated, the district court's conclusion that Mr. Barnett was the sole cause of the crash is improper.

As already explained, the district court did not err in applying the discretionary function exception to Barnett's arguments about brightness, flash sequences and general perceptibility. But even considering Barnett's allegations that the aids to navigation were too dim and not flashing quickly enough, the crash cannot reasonably be tied to anything other than Mr. Barnett's own distinct, tragic choice to navigate the Cooper River, which he

---

[17] The district court at one point refers to Mr. Barnett's negligence as the "superseding cause" of the crash. J.A. 111. However, the doctrine of superseding cause ordinarily "only applies when 'the injury was brought about by a later cause of independent origin that was not foreseeable.'" *Evergreen Int'l, S.A.*, 531 F.3d at 312 (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)); *see also* Restatement (Second) of Torts § 440 (1965) ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."). Mr. Barnett is not a "third person or other force" who intervened or cut off the causal chain in his case, nor are his acts "independent of the situation"—rather his acts and the Coast Guard's are the only two parties' acts at issue. *Rawl v. United States*, 778 F.2d 1009, 1016 (4th Cir. 1985). But because the district court also evaluated Mr. Barnett's negligence in its proximate cause analysis, any imprecision in its reference to superseding cause is not fatal to its analysis.

had successfully navigated hundreds of times before, without care. To repeat, Mr. Barnett exited the navigable channel, traveled past the green lateral aids such that they were on the right side of his boat when they should have been on his left, failed to utilize a lookout or his chart plotter—both of which were available to him—and did all of this while traveling at approximately 34 miles an hour at night. The lighting scheme—regardless of its particular features—did not cause him to take those actions. And we thus hold that his actions alone are the sole proximate cause of the allision.[18]

## IV.

Accordingly, the district court's judgment is,

*AFFIRMED.*

---

[18] Barnett also argues that the district court abused its discretion in its handling of two separate post-trial motions. First, Barnett contends that the district court should have granted her motion for judicial notice because a local notice that she sought judicial notice of "falls squarely within the type of documents for which judicial notice is proper." Op. Br. at 43. In its findings of fact and conclusions of law following the bench trial, the district court explained that it would not take judicial notice of the "Local Notice" because Barnett had failed to explain its relevance and had not pointed to "specific information in [its] thirty-seven pages that [was] relevant to the case." J.A. 122. Since Barnett does not dispute this, we hold that the district court acted within its discretion in denying Barnett's motion for judicial notice. Second, Barnett contends that the district court was wrong to conclude that the government's bill of costs was filed timely or could be filed late due to excusable neglect, emphasizing that the bill of costs was filed 265 days after the district court entered judgment in the case. Op. Br. at 36. The district court permitted the bill of costs to be filed because it found that the government's counsel's interpretation of *CX Reinsurance Co. Ltd. v. Johnson*, 977 F.3d 306, 314–15 (4th Cir. 2022), in relation to Local Civil Rule 54.03 was in good faith, even if incorrect. We find no reversible error here.